**FEDERAL INSURANCE COMPANY, et al., Plaintiffs,**

v.

**HONEYWELL, INC., d/b/a Honeywell Protection Services, Defendant.**

No. 84 Civ. 9005 (GLG).

United States District Court, S.D. New York.

Aug. 28, 1986.

Hendler & Murray, P.C., New York City (Jerome Murray, Robert G. Post, of counsel), for plaintiffs.

Davis, Polk & Wardwell, New York City (Robert B. Fiske, Jr., Lewis B. Kaden, K. Ann McDonald, Jane E. Hewett, of counsel), for defendant.

## OPINION

GOETTEL, District Judge:

In July 1978, defendant Honeywell, Inc. d/b/a Honeywell Protection Services ("Honeywell") agreed to install, maintain, and operate an alarm system at the Bronx, New York premises of the Sentry Armoured Courier Corporation ("Sentry"). Sentry paid Honeywell $1,080 for installation and agreed to pay $139 per month for ongoing service. The written contract that both parties executed expressly provides that Honeywell is not an insurer and specifically limits Honeywell's liability for its "negligent performance or failure to perform" under the contract to one-half the annual service charge, or $834.[1] Affidavit of K. Ann McDonald, Exhibit A.

---

1. The contract provides, in pertinent part,

It is understood and agreed by the parties hereto that [Honeywell] is not an insurer and

In the late evening or early morning of December 12–13, 1982, Sentry's premises were burglarized. Over $10 million was lost in the burglary. The plaintiffs in this diversity action are underwriters that have paid out on policies of insurance for Sentry covering Sentry's liability to its customers arising out of the burglary. The plaintiffs claim that Honeywell is liable to them for the amounts paid out because the Honeywell alarm installed at Sentry failed to prevent or detect the crime.

The plaintiffs assert two claims.[2] They first seek to recover against Honeywell, as Sentry's subrogees. They allege that Honeywell's gross negligence and/or willfulness, wantonness, or recklessness caused the burglary and the resultant losses. The plaintiffs' assert a second claim on their own behalf. That claim alleges that Honeywell owed a duty to the plaintiffs to properly operate, maintain, and monitor the Sentry alarm. Honeywell allegedly breached that duty by negligently operating the Sentry system.

Honeywell moves, pursuant to Fed.R. Civ.P. 56, for summary judgment on both claims. For the reasons stated below, the motion for summary judgment on the first claim is denied, and the motion for summary judgment on the second claim is granted.

I. Discussion

A. The Motion for Summary Judgment on the First Claim

Honeywell's motion on the first claim is twofold. It first contends that the terms of the Honeywell/Sentry contract limit Honeywell's liability, even for gross negligence, to one-half of Honeywell's annual service charge, or $834. Honeywell also asserts that it is entitled to summary judgment on the issue of gross negligence.

1. The Contractual Limitation on Liability

Both parties agree that the Honeywell/Sentry contract limits Honeywell's liability for negligence to $834. The plaintiffs contest Honeywell's further assertion that the contract also limits Honeywell's liability for gross negligence. The plaintiffs must prevail on this issue.

The defendant has brought to our attention a recent Massachusetts trial court decision construing the same language that limits Honeywell's liability in this action. The decision, *Boston Silver & Stone Corp. v. Honeywell, Inc.*, No. 65270, slip op. (Mass.Sup.Ct. Suffolk Co. March 10, 1986), held that the contract properly limited Honeywell's liability for gross negligence as well as for negligence.

No New York court has considered whether a burglar alarm contract could

that insurance, if any, covering personal injury and property loss or damage on [Sentry's] premises shall be obtained by [Sentry']; that [Honeywell] is being paid for the installation and maintenance of a system designed to reduce certain risks of loss and that the amounts being charged by [Honeywell] are not sufficient to guarantee that no loss will occur; that [Honeywell] is not assuming responsibility for any losses which may occur even if due to [it's] negligent performance or failure to perform any obligation under this Agreement. [Honeywell] DOES NOT MAKE ANY REPRESENTATION OR WARRANTY, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS, THAT THE SYSTEM OR SERVICE SUPPLIED MAY NOT BE COMPROMISED, OR THAT THE SYSTEM OR SERVICES WILL IN ALL CASES PROVIDE THE PROTECTION FOR WHICH IT IS INTENDED.
Since it is impractical and extremely difficult to fix actual damages which may arise due to

the faulty operation of the system or failure of services provided, if, notwithstanding the above provisions, there should arise any liability on the part of [Honeywell], such liability shall be limited to an amount equal to one half the annual service charge provided herein or $250, whichever is greater. This sum shall be complete and exclusive and shall be paid and received as liquidated damages and not as a penalty. In the event that [Sentry] wishes to increase the maximum amount of such liquidated damages, [Sentry] may, as a matter of right, obtain from [Honeywell] higher limits by paying an additional amount under a graduated scale of rates relating to the higher limits of liquidated damages.
Affidavit of K. Ann McDonald, Exhibit A.

2. The plaintiffs have voluntarily withdrawn a third claim against Honeywell asserted on behalf of Sentry's customers as their assignee.

properly limit liability for gross negligence. The defendant asserts that *Melodee Lane Lingerie Co. v. American District Telegraph Co.*, 18 N.Y.2d 57, 271 N.Y.S.2d 937, 218 N.E.2d 661 (1966) supports the validity of such a limitation. In *Melodee Lane*, the New York Court of Appeals considered whether a limitation of liability clause in a contract involving a sprinkler alarm system could limit a party's liability for negligently repairing that system. Because the contract was considered an agreement affecting real property, section 5–323 of the New York General Obligations Law, N.Y.Gen.Oblig.Law § 5–323 (McKinney 1978),[3] applied. That section applies to agreements in connection with any contract affecting real property. It voids any such agreement that exempts a contractor from liability for his own negligence. In construing section 5–323's effect on the limitation of liability clause, the Court of Appeals noted, "notwithstanding a statute such as [section 5–323], it is possible for parties to limit their liability provided that there is a voluntary choice of obtaining full or limited liability by paying under a graduated scale of rates proportioned to the responsibility in transportation or other service rendered." *Id.* 271 N.Y.S.2d at 946, 218 N.E.2d at 667 (citation omitted). The Court proceeded to invalidate the clause in issue because the subscriber had not had an opportunity to pay a service charge consonant with full liability.

The defendant urges us to expand upon the reasoning of *Melodee Lane* to uphold the validity of a clause in a burglar alarm contract limiting liability for gross negligence. The argument, as we understand it, is that because a limitation of liability clause can effectively override a statute prohibiting the exclusion of liability for negligent behaviour, a similar provision can limit liability for gross negligence even though the public policy of New York forbids the exclusion of liability for gross negligence.

The fatal shortcoming in the defendant's analysis and reasoning is its failure to account for the difference in the manner in which New York courts treat clauses that exclude liability for negligence and those that exclude liability for gross negligence. Unless a statute such as section 5–323 provides otherwise, the public policy of New York does not prevent an alarm company from exculpating itself from its own negligence when the language of the exculpatory clause is sufficiently clear.[4] *Gross v. Sweet*, 49 N.Y.2d 102, 424 N.Y.S.2d 365, 400 N.E.2d 306 (1979); *Dubovsky & Sons, Inc. v. Honeywell, Inc.*, 89 A.D.2d 993, 454 N.Y.S.2d 329 (2d Dep't 1982). The same cannot be said for gross negligence. The New York courts have consistently held that public policy precludes a party from exculpating himself from liability for his own gross negligence. *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 461 N.Y.S.2d 746, 749, 448 N.E.2d 413, 416 (1983); *Weld v. Postal Telegraph-Cable Co.*, 210 N.Y. 59, 67, 103 N.E. 957 (1913). This strong public policy voids any provision in a burglar alarm contract exculpating a party from liability for gross negligence or willful or wanton misconduct. *Gross v. Sweet, supra*, 424 N.Y.S.2d at 367, 400 N.E. at 308–09; *Modern Settings, Inc. v. American District Telegraph Co.*, App. Div., 503 N.Y.S.2d 44 (1st Dep't 1986) (available on Lexis, States lib., NY file); *Dubrovsky & Sons, Inc. v. Honeywell, Inc., supra*, 454 N.Y.S.2d at 331.

■ Although limitation on liability, as opposed to a complete exculpation, in a

---

**3.** Section 5–323 states,

Every covenant, agreement or understanding in or in connection with or collateral to any contract or agreement affecting real property made or entered into, whereby or whereunder a contractor exempts himself from liability for injuries to person or property caused by or resulting from the negligence of such contractor, his agent, servants or employees, as a result of work performed or services rendered in connection with the con-

struction, maintenance and repair of real property or its appurtenances, shall be deemed to be void as against public policy and wholly unenforceable.

N.Y.Gen.Oblig.Law § 5–323 (McKinney 1978).

**4.** Section 5–323 of New York's General Obligations Law does not apply to burglar alarms. *Dubovsky & Sons, Inc. v. Honeywell, Inc.*, 89 A.D.2d 993, 454 N.Y.S.2d 329 (2d Dep't 1982).

sprinkler alarm contract must have influenced the *Melodee Lane* court, the absence of a strong public policy against either limiting or excluding liability for negligence, no doubt, was also persuasive. The strong, indeed intractable, public policy that favors making parties accountable for gross negligence precludes the extension of the *Melodee Lane* dicta urged by the defendant. Any limitation on gross negligence in the Honeywell/Sentry contract is void.[5] Honeywell is fully liable to the plaintiffs, as Sentry's subrogees, for any gross negligence, provided all of the requisites to liability are proven.

### 2. Gross Negligence

#### a. The Proper Standard

The distinction between negligence and gross negligence is "shadowy and unsatisfactory," *Dalton v. Hamilton Hotel Operating Co.*, 242 N.Y. 481, 487, 152 N.E. 268 (1926). From the struggles of the New York courts to supply a workable definition of gross negligence have emerged two lines of thought. According to the first, the failure to exercise even slight care, scant care, or slight diligence constitutes gross negligence. *Food Pageant, Inc. v. Consolidated Edison Co.*, 54 N.Y.2d 167, 445 N.Y.S.2d 60, 62, 429 N.E.2d 738, 740 (1981) ("slight care"); *Dalton v. Hamilton Hotel Operating Co., supra*, 242 N.Y. at 488, 152 N.E. 268 ("slight diligence"); *Weld v. Postal Telegraph-Cable Co., supra*, 210 N.Y. at 72, 78, 103 N.E. 957, (1913) ("slight diligence," "slight care"). The other line of authority defines gross negligence as thoughtless disregard for the consequences of an act without any attempt to avoid them and with indifference to the rights of others impacted by the act. *Cauble v. Mabon Nugent & Co.*, 594 F.Supp. 985, 993 (S.D.N.Y.1984); *Veals v. Consolidated Edison Co.*, 114 Misc.2d 626,

627–28, 452 N.Y.S.2d 153, 155 (Civ.Ct.Kings Co.1982); *Denmark v. New York Telephone Co.*, 97 Misc.2d 205, 210–11, 411 N.Y.S.2d 506, 511 (Civ.Ct.Kings Co.1978).

Instead of reconciling these definitions or expressly choosing among them, many courts have simply incorporated both into their definition of gross negligence. These courts define gross negligence as "either a want of scant care or an indifference to the rights of others." *Doe v. New York City Department of Social Services*, 649 F.2d 134, 143 n. 4 (2d Cir.1981); *Hong Kong Export Credit Insurance Co. v. Dun & Bradstreet*, 414 F.Supp. 153, 160 (S.D.N.Y. 1975); *Warren v. New York Telephone Co.*, 70 Misc.2d 794, 335 N.Y.S.2d 25, 28 (Civ.Ct.N.Y.Co.1972); *see also* 41 *N.Y.Jur.*, Negligence § 27, at 40. Likewise, the New York Pattern Jury Instructions provide a two-pronged definition. That text states, "Gross negligence means a failure to use even slight care, or conduct that is so careless as to show complete disregard for the rights and safety of others." *N.Y. Pattern Jury Instructions* 2:10A (Supp.1986). This instruction correctly summarizes the law of gross negligence that will be applied in this case.[6]

It is this same form of gross negligence, in addition to any willful or wanton misconduct, that will overcome the limitation of liability clause in the Honeywell/Sentry contract. Thus, if there remains a triable issue of fact as to whether Honeywell did not exercise even slight care or whether it disregarded the consequences of its own actions with indifference to the rights of others, the Court must deny the defendant's motion for summary judgment on the plaintiffs' first claim.

"[T]he mere existence of *some* alleged factual dispute between the parties will not

5. We need not decide whether the terms of the Honeywell/Sentry contract actually limit liability for gross negligence.

6. Contrary to the defendant's assertion, consciousness of the probable consequences of an act is not an element of gross negligence. The defendant relies on the definition of "culpable negligence" in volume 41 of New York Jurisprudence which states that "[t]here must exist in the mind of the party charged, at the time of the act or omission, a consciousness of the probable consequences of the act, and a wanton disregard of them." 41 *N.Y.Jur.*, Negligence § 27 at 40–41 (1965). This definition is not only inapposite but also ignores the entire line of authority equating gross negligence to the absence of even slight care.

defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.*, —— U.S. ——, 106 S.Ct. 2505, 2509–10 (1986) (emphasis in original). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* It is not the function of the Court to resolve ambiguities, choose between conflicting inferences, or determine credibility on a motion for summary judgment. Instead, the record is to be interpreted in a light most favorable to the non-moving party, with all reasonable inferences drawn, and any doubts and ambiguities resolved in its favor. *Patrick v. LeFevre*, 745 F.2d 153, 158 (2d Cir.1984). "If, [so construed], the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c), then summary judgment is proper.

### b. The Pertinent Facts

Except where otherwise noted, the following facts pertinent to the motion for summary judgment on the first claim are not reasonably disputed.

### The Alarm System

Honeywell wired numerous doors, windows, and other openings and installed various other protective devices at Sentry's premises. The premises were wired with both day and night circuits. On the day circuit were devices, wiring, and switches that could be kept "on" without inhibiting the normal movement of people around the building. Sentry kept the day circuit on all the time. The night circuit included the day circuit, several additional doors and windows, and a photo-electric eye located in one of the hallways.

The Sentry alarm, together with other subscriber systems, was linked by telephone line to Honeywell's computerized central monitoring station. In the central station, a shift manager and two or three operators monitored computer screens and printouts that reflected signals from subscribers' premises. The computer screens displayed alarm signals and indicated other problems with subscriber systems. Computer terminals also provided a continuous paper printout of the activity at all Honeywell subscribers. Finally, the Honeywell computers stored a minute-by-minute log of the events at each individual subscriber. This "daily log" could be brought up on the computer at any time. A break in the day circuit or in the night circuit (if activated) would generate an alarm signal on the central station monitor and would show up on the daily log and on the printout.

Sentry had complete control over whether and when to activate (or "set") the night circuit. The following schedule was in effect at the time of the burglary:

> Set— 1:30 a.m. Saturday
> Unset— 7:00 a.m. Saturday
> Set—11:00 p.m. Saturday
> Unset— 7:00 a.m. Sunday
> Set— 9:00 p.m. Sunday
> Unset— 4:30 a.m. Monday

Sentry's schedule was entered into Honeywell's computer. If Sentry did not set the alarm within 30 minutes of the designated time, the Honeywell monitor and the printout would show Sentry as "late to close." If the Sentry guard on duty did not call Honeywell to explain why Sentry had not set the alarm (or "closed"), the Honeywell central station operators would call the Sentry premises.

The parties differ as to whether Sentry guards were authorized to tell Honeywell that Sentry would *not* be setting its alarm on a particular evening. According to the defendant, all those authorized to operate the alarm system, including guards, could make such temporary schedule changes. Honeywell asserts that guards could not make such changes, and it programmed its computer accordingly.

In order to set the night circuit, the Sentry guard punched a code into the alarm box at Sentry and then threw a toggle switch. If the alarm set properly, Honeywell's computer caused a device to

ring twice at Sentry's premises. This "ring back" feature notified the guard that the alarm was set. If the alarm did not set properly, the alarm would not ring back, and Honeywell operators checking on Sentry would see a "trouble" signal on the computer screen and on the printout. In addition, the system might set briefly and then immediately prompt an "alarm" reading. This "ring off" would also indicate trouble with the system.

The Honeywell operator on duty normally tried to ascertain the nature of any trouble at Sentry by calling the guard on duty. If the trouble could not be cleared up, the customer was put on the service log and the alarm repaired as soon as was reasonably possible. Of course, Honeywell was not obligated to repair the system until Sentry provided access to its premises. Sentry provided such access on weekdays during the daytime. It did not provide access at night on weekends. Whether access was provided at other times is unclear.

If repairs could not be effected during the eight hour shift within which it arose, the alarm was placed in "test." In that condition, no signals came through the system. If the system was not placed in test, alarm signals that might interfere with recognition of legitimate alarms from other Honeywell subscribers continued to come up on the Honeywell computer screen. The parties dispute whether Honeywell was obligated to notify Sentry executives on a so-called "emergency contact list" in the event that the alarm was malfunctioning and in need of repair.

In addition to its alarm system, Sentry had at least one armed guard and a guard dog on the premises twenty-four hours a day, seven days a week. Honeywell knew that Sentry maintained this additional protection.

### The Weekend Prior to the Burglary

On Saturday, December 4, 1982, at 2:46 a.m., the Sentry guard attempted to set the alarm system. The system did not set properly and the Honeywell computer registered a "trouble" reading. Approximately one hour later, the Honeywell shift man-

ager placed the system in "test." At or about this time, an entry was also made in the Honeywell service log indicating that the Sentry alarm system should be repaired as soon as possible. No one on the Sentry emergency contact list was advised that the alarm was not functioning.

Gerald O'Brien, the manager on the next shift, did not dispatch anyone to repair the Sentry system. When the Sentry guard was again unable to set the alarm on Saturday night, Honeywell again placed it in "test." The following day, O'Brien took the alarm out of "test." When, later in his shift, the alarm could not be set, O'Brien punched "In For Service" on the Honeywell computer and placed the system back in "test."

On Monday, December 6, Sal Nicosia, a Honeywell repairman, was dispatched to Sentry. After three hours of repair work, he concluded that the alarm system was now working properly. For the rest of the week, the day circuit remained on.

### The Weekend of the Burglary

On Saturday, December 11, at 2:26 a.m., Chris Potamitis, the Sentry guard, set the alarm. The alarm went off two minutes later. Potamitis tried to set the system again, and it immediately went into alarm. This happened a third time. At or about this time, Dennis O'Leary, the Honeywell Shift Manager on duty, called Sentry and attempted to resolve the problem. He spoke to Potamitis. After they were unable to resolve the problem, O'Leary concluded that the system was broken, and he told Potamitis that he would put the system in for service. Properly assuming that Honeywell could not gain access to Sentry at that time of night, he placed the system in "test" and instructed Alan Triolo, a manager trainee, to enter Sentry in the Honeywell service log. O'Leary did not notify anyone at Sentry other than Potamitis that the system was broken.

At 8:00 a.m. Saturday morning, Gerald O'Brien took over as shift manager. Shortly after arriving, he reviewed the service log and noted the entry for Sentry. He

also examined the previous evening's daily log for Sentry. It contained the notation "Guards in Building" next to 2:38 a.m. O'Brien thought that guards walking around Sentry's premises might have triggered the repeated alarms. He states that he called the Sentry premises some time between 10:00 a.m. and 12:00 noon to check on the previous night's events. The plaintiffs strenuously assert that no such call was ever made. It is undisputed that O'Brien neither consulted with the person he was relieving, nor reviewed the service cards for Sentry which set forth Sentry's repair history. Ultimately, O'Brien entered three "x's" on the service log, canceling the service call, and wrote "Guards in Building" on the service log next to the cancelled service call.

Sentry was scheduled to set its alarm at 11:00 p.m. Saturday night but failed to do so. At 11:30 p.m., the Honeywell computer indicated that Sentry was "late to close." Frank Bay, one of the Honeywell operators on duty, called Sentry at 11:40 p.m. and spoke to Lawrence Johnson, a guard. Johnson told Bay that Sentry might not "lock up at all." As a result, the alarm, which at some point had been switched back to the day circuit, remained in the "day mode" through the night and all day Sunday.

At approximately 4:00 p.m. Sunday, Sal Nicosa, who was in the vicinity of the Sentry premises, and who had noticed that Sentry had again been listed in the service log, radioed the shift manager and asked whether he should attempt to repair the Sentry alarm system. About two minutes later, without calling Sentry, the shift manager radioed back and told Nicosa to disregard Sentry because they would not give access to the premises.

Sentry was scheduled to close at 9:00 p.m. Sunday night, but Potamitis, who again was on duty, did not set the system at the prescribed time. No one at Honeywell called Sentry to advise them that they were late to close. At 10:13 p.m., Potamitis threw the toggle switch to set the alarm. The system did not set, and a trouble signal came up on the Honeywell computer. O'Leary, who was again on duty as the Honeywell shift manager, noticed the trouble signal. Assuming that the system was still broken, he again put the system in test. He did not send a serviceman, contact the Sentry premises, contact anyone on the Sentry emergency contact list, or enter Sentry in the service log.

Later the same evening or early the following morning, Sentry was burglarized. The burglary was an "inside job," perpetrated by, among others, Potamitis, who was subsequently convicted for his participation.

After Honeywell learned of the burglary, it dispatched Carmine Cappiello, a repairman, to Sentry's premises. Capiello determined that the system could not be set because of a broken microswitch. The defect was the result of normal wear and tear.

### c. Application of the Standard

■ The plaintiffs claim that the following acts together and singly, constitute gross negligence by Honeywell: (1) O'Leary's failure to notify anyone on the Sentry emergency contact list that the system was broken on the nights of December 11 and 12; (2) O'Leary's failure to call Sentry on the evening of December 12 and advise them that they were late to close; (3) the instruction to Sal Nicosa to disregard Sentry after Nicosa volunteered to repair the system; (4) O'Brien's cancellation of the December 11 service log entry and failure to dispatch a serviceman on December 11 or 12; and (5) Honeywell's failure on other weekends to dispatch a serviceman even though Sentry was listed in the service log. At a minimum, O'Brien's cancellation of the service call and Honeywell's subsequent failure to repair the system during the weekend of the burglary raise a triable issue of fact as to whether Honeywell was grossly negligent and preclude the entry of summary judgment on that issue.

When O'Brien arrived at Honeywell on December 12, he noted the entry in the previous evening's service log, as well as the notation "Guards in Building" in the daily log. Interpreted in a light most fa-

vorable to the plaintiffs, the record indicates that O'Brien relied solely on the daily log in cancelling the service call. For purposes of this motion only, we assume—as the defendant concedes we must—that O'Brien did not call Sentry to investigate further. He did not speak to the prior shift manager to ascertain the exact nature of the trouble the previous evening. Nor did he check Sentry's service card, which would have revealed Sentry's history of equipment related problems.

The defendant asserts that the "Guards in Building" notation is itself sufficient to dispose of any issue of gross negligence with respect to the cancellation of the service call. O'Brien's own testimony helps defeat this contention. His deposition testimony evidences a marked uncertainty about the origins of the trouble at Sentry early Saturday morning. When asked whether he thought guards in the building or equipment problems had caused the previous night's difficulties, O'Brien stated that it could "go either way." Appendix to Memorandum of Plaintiffs, Exhibit 7, at 72. Either the problem was guards in the building or a broken system, he was not sure. Yet, he ignored his own counsel, and instead of investigating an uncertain situation, he took a 50/50 shot at making the correct decision, imperiling Sentry in the process. Although this construction of the facts is far from indisputable, it is available to the plaintiffs on this motion. It, in turn, suggests a scenario that a reasonable jury could find indicative of the absence of even slight care and, perhaps, indifference to the rights of Sentry. Of course, a jury finding that O'Brien was not grossly negligent is also possible, if not probable.

The defendant attempts to discount the significance of the notation in the service log by arguing that O'Brien might have concluded that Triolo erroneously entered Sentry in the service log in an excess of caution. Of course, the competing inference that O'Brien simply ignored a notation that he thought proper is also permissible. Since, on this motion, the Court cannot choose between competing inferences, the defendant's effort to discredit the service log entry cannot succeed at this time.

The defendant also points out that even if O'Brien recklessly cancelled the service call, the plaintiffs cannot recover if Honeywell establishes that Sentry denied it weekend access. Although much of the evidence adduced thus far supports the inference that such access was denied, significant documentary and testimonial evidence to the contrary precludes resolution of the access issue at this stage.

In addition, the defendant argues that the Nicosia incident negates the impact of O'Brien's alleged gross negligence. According to the defendant, Nicosia did not notice any change in the service log, sought to make the repair, but was told he would be denied access. Therefore, it did not matter that O'Brien cancelled the service call. But Honeywell's is not the only interpretation. Had O'Brien not cancelled the service call, Honeywell might have sent a serviceman to Sentry, and Sentry might have provided access. Moreover, since no one at Honeywell called Sentry to determine if access would be provided, Nicosia may have received an incorrect instruction. Such neglect might also constitute gross negligence.

Equally unavailing is Honeywell's argument that, because Sentry kept an around-the-clock guard and guard dog at its premises, Honeywell could never be grossly negligent. Were we to hold that Honeywell could never be found grossly negligent, we would, in effect, be deeming the Honeywell/Sentry contract wholly unnecessary. The better view is that the alarm system supplemented the guard and guard dog and, in particular, protected against an "inside job."

The two burglar alarm cases cited by the defendant on its motion on the first claim lend it no support since the cases do not apply the legal standard applicable in New York to claims of gross negligence. In *Fireman's Fund Insurance Co. v. Morse Signal Devices*, 151 Cal.App.3d 681, 198 Cal.Rptr. 756 (2d Dist.1984), the court affirmed the dismissal of an insurance company's claim against an alarm company that failed to notify police and fire officials

after receiving alarm signals from the premises of the insured. Although the court provided no discussion to support its conclusion, it appears to have applied a standard of gross negligence akin to willfulness or wantonness. Similarly, in *Nicholas v. Miami Burglar Alarm Co.*, 339 So.2d 175 (Fla.Sup.Ct.1976), the Florida Supreme Court affirmed a directed verdict holding that the defendant had been neither willful nor malicious.

More instructive is *Douglas W. Randall, Inc. v. AFA Protective Systems, Inc.*, 516 F.Supp. 1122 (E.D.Pa.1981), *aff'd without opinion*, 688 F.2d 820 (3d Cir.1982), cited by the plaintiffs. Unbeknownst to the plaintiff in that case, the defendant alarm company effectively disabled the plaintiff's burglar alarm in order to prevent false alarms. After the alarm failed to detect a robbery, the plaintiff sued. Applying a standard equivalent to "lack of slight care," the court denied the defendant's motion for a judgment notwithstanding the verdict and held that the jury did not err as a matter of law in finding for the plaintiff on its claim of gross negligence.

The facts in this case are similar. During the weekend of the burglary, Honeywell effectively disabled the alarm in order to prevent false alarms. Except for the guard on duty, no one at Sentry knew of the disability. Given some similarity between the two cases, the *Douglas W. Randall, Inc.* court's decision upholding a jury's finding of gross negligence supports denying the defendant's motion for summary judgment herein.[7] *See* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2524 (1971) (standard for granting motion for judgment notwithstanding verdict is essentially the same as that for granting a motion for summary judgment).

The defendant asserts that the two cases differ because Douglas W. Randall, Inc.'s premises were not protected by a guard and guard dog. As noted earlier, the presence of the guard and the guard dog can-

not alone justify taking the issue of gross negligence from the jury. *See supra* p. 1567.

Because genuine issues of material fact remain as to whether Honeywell was grossly negligent during the weekend of the burglary, the defendant's motion for summary judgment on the plaintiffs' first claim is denied.

**B. The Motion for Summary Judgment on the Second Claim**

The defendant premises its motion for summary judgment on the second claim, asserted directly against Honeywell, on the absence of any duty owing from Honeywell to the plaintiff insurers. Absent such a duty, the plaintiffs, none of whom is a party to a contract with Honeywell, cannot state a claim in tort against Honeywell for acts which constitute a breach of that contract. 41 *N.Y.Jur.*, Negligence § 13 (1965).

Both sides agree that *Ultamares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1933), and its progeny provide the pertinent standard for determining when a duty not to breach a contract is owed to one not a party to the contract. In *Ultramares*, Chief Judge Cardozo considered whether and when liability could be imposed upon accountants in favor of noncontractual parties for the negligent preparation of financial reports. The defendant accountants had prepared a certified balance sheet for their client to whom they provided 32 copies. The client, in turn, gave a copy to the plaintiff company. The latter detrimentally relied thereon. The court refused to hold the accountants liable in negligence to their client's lender, with whom they had no contractual relationship. Cardozo explained the court's holding with characteristic flair. He wrote,

> If liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the

---

7. The other case discussed by the plaintiff, *Carriage Meat Co. v. Honeywell, Inc.*, 442 So.2d 796 (La.Ct.App. 4th Cir.1983), is inapposite. In that case, the court refused to grant summary judgment on the issue of gross negligence because there was evidence that central station personnel had not responded to a temperature alarm. There is no evidence in the instant case that Honeywell either received or ignored an alarm.

cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class. The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes to these consequences.

*Id.* at 179, 174 N.E. 441.

In *Ultramares,* the Court of Appeals also reaffirmed its decision in *Glanzer v. Shepherd,* 233 N.Y. 236, 135 N.E. 275 (1922), holding a public weigher liable to the plaintiff for negligence despite the absence of a contract between the two. According to Cardozo, a bond "so close as to approach that of privity" was sufficient to support liability in that case. *Ultramares Corp. v. Touche, supra,* 255 N.Y. at 182–83, 174 N.E. 441. In *Credit Alliance Corp. v. Arthur Anderson & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985), the Court of Appeals "restate[d] and elaborate[d] upon [its] adherence to [this] standard...." *Id.* at 440, 483 N.E.2d 114–15. The court listed the following prerequisites to holding accountants liable in negligence to noncontractual parties:

(1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

*Id.* at 443, 483 N.E.2d 118. *See also Westpac Banking Corp. v. Deschamps,* 66 N.Y.2d 16, 494 N.Y.S.2d 848, 849, 484 N.E.2d 1351, 1352, 849 (1985) (quoting this language). *Credit Alliance* and *Westpac Banking* provide the standard for determining whether a party to a contract is liable to a non-privy for negligently breaching the contract in a variety of contexts, *see, e.g., Henry v. Michael P. Guastella & Associates, Inc.,* 113 A.D.2d 435, 496 N.Y.S.2d 591 (4th Dep't 1985) (suit by passenger against driver's insured), including the situation at bar.

■ The uncontroverted facts establish beyond doubt that the plaintiffs, admittedly non-parties to the Honeywell/Sentry contract, cannot satisfy two of the three prerequisites to liability under *Credit Alliance.* That Honeywell did not know the identity of any of the plaintiff insurers is undisputed. At most, the plaintiffs have alleged that they were members of a particularized class whom Honeywell knew would rely on Honeywell's representations. In addition, Sentry allegedly advised Honeywell that its unnamed insurers required a certain level of alarm protection. Such generalized knowledge of a class of potential underwriters with whom Sentry might deal or of a single unnamed underwriter who might rely is plainly insufficient to satisfy the second *Credit Alliance* requirement. Instead, there must be "knowledge of 'the identity of the specific nonprivy party who would be relying....'" *Lumbard v. Maglia, Inc.,* 621 F.Supp. 1542, 1545 (S.D.N.Y.1985) (quoting *Westpac Banking Corp., supra,* 494 N.Y.S.2d at 850, 484 N.E. at 1353. (quoting *Credit Alliance, supra,* 493 N.Y.S.2d at 445, 483 N.E. at 120)).

In *Westpac Banking,* the plaintiff alleged that the defendant accountants knew that their client would use its financial statements to obtain a bridge loan. The accountants were thus aware of the existence of a potential class of bridge lenders. However, the court found that the absence of any evidence that the accountants knew that their client would show the reports to the plaintiff, prevented the plaintiff from meeting *Credit Alliance*'s second requirement of specific knowledge. *Westpac Banking, supra,* 494 N.Y.S.2d at 850, 484 N.E. at 1353. This case fits squarely within the ambit of that holding.

The plaintiffs fail the third part of the *Credit Alliance* test as well. "[T]here is simply no [evidence] of any word or action on [Honeywell's part] directed to the plaintiffs, or anything contained in [Honeywell's contract with Sentry] which provided the necessary link between them." *Westpac Banking, supra,* 494 N.Y.S.2d at 849–50, 484 N.E. at 1351–53. There is no evidence

that Honeywell dealt directly with the plaintiff underwriters, agreed with Sentry to install the alarm system for any specific underwriter's benefit, or agreed or actually did provide the plaintiff underwriters directly with copies of any documentation concerning Sentry's protection. Indeed, a representative of plaintiff Federal Insurance Co., the lead underwriter, admitted in his deposition that, to his knowledge, Federal had had no direct contact with Honeywell as to the Sentry account, and that Federal received no direct representations as to the quality of protection Sentry was to receive.

The plaintiffs' failure to satisfy two of *Credit Alliance*'s three requirements for imposing liability for negligence on a non-privy mandates an award of summary judgment in the defendant's favor on the plaintiffs' second claim.

II. Conclusion

The defendant's motion for summary judgment on the plaintiffs' claim as Sentry's subrogees is denied. The motion for summary judgment limiting any award of damages on that claim to $834 is also denied. The defendant's motion for summary judgment on the plaintiffs' second claim against Honeywell is granted.

The parties are directed to prepare a pretrial order that includes a list of stipulated facts. Following the filing of the order, this action shall be placed on the ready trial calendar.

SO ORDERED.