263 P.3d 633

**FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Plaintiff/Appellant/Cross–Appellee,**

v.

**BONDWRITER SOUTHWEST, INC.; David G. Sparks; Jane Sparks; Katherine Stanton, Defendants/Third Party Plaintiffs/Appellees/Cross–Appellants.**

No. 1 CA–CV 09–0612.

Court of Appeals of Arizona,
Division 1, Department B.

July 28, 2011.

Lewis Brisbois Bisgaard & Smith LLP by Karen L. Karr, Dominique Barrett, Phoenix, Attorneys for Plaintiff/Appellant/Cross–Appellee.

Curtis Ensign, P.L.L.C. by Curtis Ensign, Phoenix, Attorneys for Defendant/Appellee/Cross–Appellant.

## OPINION

GEMMILL, Judge.

¶ 1 Fidelity and Deposit Company of Maryland ("Fidelity") sued Bondwriter Southwest, Inc., David Sparks, and Katherine Stanton (collectively "Bondwriter") for breach of contract and negligence. After a three-day bench trial, the court ruled in Fidelity's favor on both claims and found Fidelity sustained damages in excess of $511,000. The court also concluded that Bondwriter was only five percent at fault and awarded Fidelity judgment against Bondwriter for $25,533.04. Fidelity appeals the court's judgment, arguing that the trial court erred by apportioning its contract damages based upon fault. Bondwriter cross appeals, raising several issues involving the court's rulings on the underlying claims.

¶ 2 We conclude that comparative fault principles are not applicable to Fidelity's breach of contract claim against Bondwriter. We affirm in part, vacate in part, and remand for a redetermination of the attorneys' fees award, for entry of a revised judgment in favor of Fidelity, and for any other appropriate proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶ 3 Fidelity and Bondwriter are corporations authorized to conduct surety business in Arizona. David Sparks is the president and CEO of Bondwriter. Katherine Stanton is an employee and agent of Bondwriter.

¶ 4 In 2000, Fidelity and Bondwriter entered into an agency agreement. The agreement authorized Bondwriter to solicit applications for surety bonds on behalf of Fidelity and also to collect premiums for those bonds.

The agreement limited Bondwriter's authority to act on behalf of Fidelity. Specifically, the agreement provided the following:

### LIMITATION OF AUTHORITY OF AGENT

EIGHTEENTH Nothing herein contained shall be considered or construed as authorizing Agent or any of its employees or subagents to represent the Company for any lines or types of bonds or policies except those which are specifically authorized by Company to Agent, its employees, and/or sub-agents, through any Specific Authorization incorporated herein. Agent shall be responsible for all acts of its employees, and/or sub-agents. Agent shall indemnify and save Company harmless from all costs, causes of action, and damages suffered by Company resulting from unauthorized acts or transactions by Agent, its employees, and/or sub-agents, but only to the extent the Agent would have been liable to the Company by statute or common law for those costs, causes of action, and damages.

NINETEENTH The authority of Agent shall extend no further than is expressly stated in this Agreement and attachments hereto. Agent shall not make, alter, or discharge contracts for Company or waive forfeitures or proofs of loss, grant permits, quote extra rates for special risks, extend the time for payment of premiums, attempt to commit Company to the payment of any claim, or bind Company in any way not specifically authorized. Agent shall not make oral or written representations to insured which would attempt to modify the terms or conditions of any bond or policy.

Attached to the agency agreement was a document entitled Power of Attorney Instructions and Discretionary Authority ("power of attorney agreement"). In the power of attorney agreement, Fidelity gave Sparks and Stanton power of attorney, and Sparks and Stanton agreed to submit all bond requests to Fidelity "for approval and specific authority obtained before the bond is executed or a commitment is given."

¶ 5 In July 2004, Bondwriter requested authority to issue performance and payment bonds to Adaptive CM. ("Adaptive"), a general contractor and construction management company owned by Paul and Tina Nelson. According to trial testimony, a performance bond is usually issued with a contract and guarantees that the contract will be performed. A payment bond is usually issued in conjunction with a performance bond and guarantees payment of any subcontractors or supplies.

¶ 6 Adaptive needed the bonds for two separate construction projects. One project was for the City of Flagstaff ("Flagstaff Project") and the requested bond amount for that project was $2,379,724. The other project was for Arizona State University ("ASU Project"), for which the bond amount was $784,774. Fidelity informed Sparks that it approved the bond request for the ASU Project but had not approved the request for the Flagstaff Project because Fidelity needed additional financial information from Adaptive.

¶ 7 On July 19, 2004, Sparks e-mailed Adaptive that Bondwriter had received approval for the ASU Project and that the bonds for that project would be delivered the next morning. Sparks said Fidelity had deferred approval on the Flagstaff Project bonds until it received further financial information from Adaptive.

¶ 8 The next day, Sparks asked Stanton to issue the bonds for Adaptive. Stanton mistakenly believed Sparks' request related to the Flagstaff Project and she issued payment and performance bonds to Adaptive for the Flagstaff Project in the amount of $2,379,724. That same day, Sparks delivered the Flagstaff Project bonds to Adaptive's receptionist. Unfortunately, in a departure from his usual practice, Sparks did not review the bonds before he dropped them off.

¶ 9 A few hours later, Sparks and Stanton discovered that they (i.e., Bondwriter) had issued the wrong bonds. Stanton immediately contacted both Fidelity and Adaptive and advised them of the error and told them Sparks was returning to Adaptive's office to retrieve the bonds. An employee of Adaptive replied that the bonds were still at the front desk. When Sparks arrived, how-

ever, he was told that the bonds were locked in Paul Nelson's office and could not be retrieved. Sparks returned to Adaptive's office the next day and was able to retrieve the original bonds at that time. Stanton called Fidelity and advised that Sparks had retrieved the Flagstaff Project bonds from Adaptive. No one affiliated with Fidelity or Bondwriter contacted Flagstaff to advise it of the error.

¶ 10 Only later was it revealed that before Bondwriter was able to retrieve the Flagstaff Project bonds from Adaptive, Paul Nelson signed the bonds and had them photocopied. Shortly thereafter, Adaptive delivered the copies to Flagstaff. Even though the City's procedures required contractors to provide original bonds, the City accepted the bonds without examining them to determine whether they were originals or copies.

¶ 11 On July 26, 2004, Flagstaff sent Adaptive a notice to proceed on the Flagstaff Project. Unbeknownst to Fidelity or Bondwriter, Adaptive began work on the Flagstaff Project the next day. The following month, Fidelity informed Bondwriter and Adaptive that it was not going to issue bonds for the Flagstaff Project. Adaptive never told Bondwriter or Fidelity that it had copied the original bonds and delivered them to Flagstaff to secure its construction contract.

¶ 12 In 2005, after Adaptive was unable to complete the Flagstaff Project, Fidelity received claims on the bonds from Flagstaff and the project's subcontractors. Fidelity investigated and learned that the City possessed only copies of the bonds and considered whether the copied bonds would be binding on Fidelity. Fidelity's attorneys conferred with outside counsel to evaluate Fidelity's liability on the bonds and ultimately decided to honor the bonds because it concluded it was legally obligated to do so. Fidelity paid a total of $875,735 in claims and expenses to finish the project and received $364,674 in payments from Flagstaff.

¶ 13 In January 2006, Fidelity filed a complaint against Bondwriter alleging breach of contract and negligence. Fidelity alleged that Bondwriter breached its contracts with Fidelity by issuing and delivering the Flagstaff Project bonds to Adaptive without authorization from Fidelity. Fidelity also alleged that Bondwriter was negligent in issuing the bonds without authority.

¶ 14 Bondwriter filed a notice identifying Flagstaff and Adaptive as non-parties at fault and also filed a third-party complaint against Adaptive and Paul and Tina Nelson, alleging negligence, negligent misrepresentation, common law fraud, and common law indemnity.

¶ 15 Fidelity moved for partial summary judgment on its breach of contract claim. The court denied the motion but ordered the parties to brief whether Arizona Revised Statutes ("A.R.S.") § 34–222 (2011)[1] required Flagstaff to have the original bonds before it could make a valid claim on them. The court subsequently ruled the bonds were not valid:

> The Court finds that pursuant to A.R.S. § 34–222 the original bond was not delivered to the City of Flagstaff and therefore was an invalid bond. The Court further relies on *Larson v. National Surety Co.,* 171 Minn. 455, 214 N.W. 507 (1927), as persuasive authority in support of this ruling.

¶ 16 Relying on that ruling, Bondwriter filed its own motion for summary judgment. Bondwriter argued that because the bonds were not validly delivered to Flagstaff, Bondwriter did not "execute" the bonds and therefore did not breach the agency agreement. In addition, Bondwriter asserted that it did not breach its duty to Fidelity by executing a bond without proper authority. The court denied Bondwriter's motion.

¶ 17 The matter proceeded to a three-day bench trial, after which the court found in favor of Fidelity on both breach of contract and negligence. The court concluded that Bondwriter breached its contract with Fidelity "by executing the Flagstaff bonds without authority." The court found that "[a]s a result of their breach, unauthorized bonds

---

1. We cite to the current version of the applicable statute because no revisions material to this decision have since occurred.

were issued and relied upon, causing [Fidelity] to sustain damages" in the amount of $511,061. Regarding the negligence claim, the court concluded that Bondwriter was negligent, and as a result of its negligence, Fidelity sustained damages in the amount of $511,061. The court, however, found Adaptive, Haver, and Nelson 75 percent at fault, Flagstaff 20 percent at fault, and Bondwriter five percent at fault. The court entered a judgment against Bondwriter for $25,553 (five percent of $511,061). The court also awarded Fidelity a portion of its attorneys' fees and costs. The court further entered a default judgment against Adaptive and Paul and Tina Nelson on Bondwriter's third party complaint.

¶ 18 Fidelity timely appealed, and Bondwriter timely cross-appealed. We have jurisdiction pursuant to A.R.S. § 12–2101(B) (2003).

### FIDELITY'S APPEAL

### Apportionment Of Damages Based On Comparative Fault In Fidelity's Breach Of Contract Claim

¶ 19 The primary issue Fidelity raises on appeal is whether the trial court erred by apportioning Fidelity's breach of contract damages based upon allocation of fault found on the negligence claim. The court concluded that Fidelity incurred $511,061 in damages as a result of Bondwriter's breach but that Bondwriter was only five percent at fault and therefore awarded judgment against Bondwriter for only $25,553. We agree with Fidelity that damages resulting from Bondwriter's breach of contract may not be allocated according to our comparative fault statutes.

¶ 20 Both parties agree that the court apportioned damages based upon A.R.S. § 12–2506 (2003). Section 12–2506(A) provides in pertinent part:

In an action for *personal injury, property damage or wrongful death*, the liability of each defendant for damages is several only and is not joint, except as otherwise provided in this section. Each defendant is liable only for the amount of damages allocated to that defendant in direct proportion that defendant's percentage of *fault*,

and a separate judgment shall be entered against the defendant for that amount.

(Emphasis added.) Section 12–2506(F)(2) defines "fault" as:

an actionable breach of legal duty, act or omission proximately causing or contributing to injury or damages sustained by a person seeking recovery, including negligence in all of its degrees, contributory negligence, assumption of risk, strict liability, breach of express or implied warranty of a product, products liability and misuse, modification or abuse of a product.

Based primarily on the plain language of these provisions, we conclude comparative fault principles do not apply to Fidelity's breach of contract claim.

¶ 21 We initially note that § 12–2506 is applicable to actions for "personal injury, property damage or wrongful death." An ordinary breach of contract claim is not encompassed within this language. Similarly, ordinary breach of contract is logically not included within the definition of "fault" in § 12–2506(F)(2), because contract law generally "operates without regard to fault." 3 E. Allan Farnsworth, *Farnsworth on Contracts* § 12.8, at 195–96 (3d ed. 2004); *see Klingler Farms, Inc. v. Effingham Equity, Inc.*, 171 Ill.App.3d 567, 121 Ill.Dec. 865, 525 N.E.2d 1172, 1176 (1988) ("The concept of fault is one of the major distinctions between contract law and tort law."); *Lesmeister v. Dilly*, 330 N.W.2d 95, 101 (Minn.1983) ("[C]ontract law has never spoken in terms of fault; the contract measure of damages generally is based on recovery of the expectancy or benefit of the bargain.").

¶ 22 Our conclusion that comparative fault principles are not intended to apply to an ordinary breach of contract claim is further supported by consideration of the history and purpose of § 12–2506. In 1984, the Arizona legislature adopted the Uniform Contribution Among Tortfeasors Act ("UCATA"). *See* 1984 Ariz. Sess. Laws, ch. 237, § 1 (2d. Reg. Sess.). This legislation is set forth in A.R.S. §§ 12–2501 to –2509. *See id.* In 1987, the legislature amended UCATA and A.R.S. § 12–2506 to largely abolish joint and several liability and replace it with a system of sever-

al liability based on comparative fault. *See* 1987 Ariz. Sess. Laws, ch. 1, § 2 (1st Reg. Sess.). By amending § 12–2506, the legislature intended to create "a system of comparative fault that requires *tort-feasors* to pay for the damages they cause, but no more." 1997 Ariz. Sess. Laws, ch. 259, § 3 (1st Reg. Sess.) (emphasis added). Furthermore, our supreme court has recognized that "the general goal of the present version of UCATA is to make each *tortfeasor* responsible for only its share of fault." *Jimenez v. Sears, Roebuck and Co.*, 183 Ariz. 399, 404, 904 P.2d 861, 866 (1995) (emphasis added) (emphasis in original omitted). The comparative fault principles established by UCATA apply to "tortfeasors."

¶ 23 Other jurisdictions have reached similar conclusions. *Haysville U.S.D. No. 261 v. GAF Corp.*, 233 Kan. 635, 666 P.2d 192, 199 (1983) ("The use of the comparative negligence theory is not proper in breach of contract actions."); *Klingler Farms, Inc.*, 121 Ill.Dec. 865, 525 N.E.2d at 1176 (declining to extend comparative fault principles to causes of action in contract); *Lesmeister*, 330 N.W.2d at 101–02 (concluding that Minnesota's comparative fault statute did not apply generally to contract cases); *Bd. of Educ. of the Hudson City Sch. Dist. v. Sargent, Webster, Crenshaw & Folley*, 71 N.Y.2d 21, 523 N.Y.S.2d 475, 517 N.E.2d 1360, 1364 (1987) (stating that permitting apportionment of liability in actions arising from breach of contract would "do violence" to settled principles of contract law); *Sassen v. Tanglegrove Townhouse Condo. Ass'n*, 877 S.W.2d 489, 493 (Tex.App.1994) ("[R]eduction in damages under comparative negligence is applicable to negligence actions only and not to recoveries for breach of contract.").

¶ 24 Bondwriter contends, however, that § 12–2506 is broad enough to encompass actions in contract. It argues that the statute's definition of "fault" includes "breach of a legal duty." This argument, however, does not persuade us to adopt Bondwriter's position. In the context of the UCATA, we do not believe that breach of a contractual undertaking is included within the meaning of "breach of a legal duty."

¶ 25 Bondwriter also argues that because the definition in A.R.S. § 12–2501(G) (2003) of "property damage" includes economic losses, the statute must therefore apply to breach of contract actions. Economic losses, however, may result from tortious conduct or from breach of contract. Tort recovery is available for purely economic losses in many instances. See *Flagstaff Affordable Hous. Ltd. P'ship v. Design Alliance, Inc.*, 223 Ariz. 320, 323, ¶ 12, 223 P.3d 664, 667 (2010). The fact that economic losses are included within the definition of "property damage" does not compel the conclusion that the comparative fault provisions of UCATA apply to breach of contract claims.

¶ 26 Finally, Bondwriter asserts that the court may have reduced Fidelity's damages based on some unexpressed conclusion that Fidelity was at fault. The court, however, did not apportion any fault to Fidelity and, even if it had, the court could not reduce Fidelity's contract damages based upon comparative fault principles under UCATA. Accordingly, we conclude the court erred in reducing Fidelity's breach of contract damages to conform with Bondwriter's percentage of fault on the negligence claim. We therefore vacate the court's judgment with respect to the damages and remand for an entry of a revised judgment in favor of Fidelity.

### The Award Of Attorneys' Fees On Fidelity's Breach Of Contract Claim

¶ 27 Fidelity also contends that the trial court abused its discretion in its award of attorneys' fees. Under A.R.S. § 12–341.01(A) (2003), a court may award reasonable attorneys' fees to the successful party in a contested action arising out of contract. Here, the court awarded Fidelity $4,000 in attorneys' fees pursuant to § 12–341.01(A). This amount is approximately five percent of the $79,587 in attorneys' fees requested by Fidelity. It thus appears the court apportioned attorneys' fees on Fidelity's contract claim based upon Bondwriter's allocation of fault on the negligence claim. Because we have determined that comparative fault principles do not apply to this breach of contract

claim, we vacate the award of fees and remand for a redetermination of reasonable fees in light of this decision.

## BONDWRITER'S CROSS–APPEAL

### Fidelity Did Not Ratify Bondwriter's Actions

¶ 28 Bondwriter argues that the trial court erred by failing to grant it judgment on both claims because Fidelity ratified any breach by Bondwriter when Fidelity affirmed its obligations under the bonds.

¶ 29 The court did not specifically mention the issue of ratification in its ruling. It did, however, find that the "City of Flagstaff threatened litigation against [Fidelity] if payment on the claims was not made. Subcontractors threatened[,] to walk off the job if they were not paid. The project was delayed which meant liquidated damages for the delay could be assessed."[2] The court also found that Fidelity "considered the effect a denial of the claim would have on other agreements, including a settlement agreement with its parent company, Zurich." Based upon these findings and the court's ruling in favor of Fidelity coupled with the usual presumption that the court made all necessary findings to support its judgment, *see Garden Lakes Cmty. Ass'n v. Madigan*, 204 Ariz. 238, 240, ¶ 9, 62 P.3d 983, 985 (App.2003), we must presume the court concluded that Fidelity did not ratify Bondwriter's actions.

¶ 30 "Arizona courts generally follow the Restatement of Agency." *Ruesga v. Kindred Nursing Ctrs., L.L.C.*, 215 Ariz. 589, 597 n. 5, ¶ 28, 161 P.3d 1253, 1261 n. 5 (App.2007). Bondwriter argues that we should apply the Restatement (Second) of Agency because the Restatement (Third) of Agency was not promulgated until after the events in this case occurred. Because we conclude that under either version Fidelity did not ratify Bondwriter's actions, we need not decide which version of the Restatement is most applicable to the facts of this case.

¶ 31 "Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." Restatement (Second) of Agency § 82 (1958); *see also* Restatement (Third) of Agency § 4.01(1) (2006) ("Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority."). Ratification recasts the legal relations between the principal and agent as they would have been had the agent acted with actual authority. Restatement (Third) of Agency § 4.02 cmt. b. Ratification is not effective in favor of an agent against a principal when "the principal is obliged to affirm in order to protect his own interests[,]" Restatement (Second) of Agency § 101(b), or when the principal ratifies to avoid a loss. Restatement (Third) of Agency § 4.02(2)(b).

¶ 32 There is sufficient evidence in the record from which the court could have concluded that Fidelity did not ratify Bondwriter's actions because Fidelity, in affirming its obligation under the bonds, was acting to protect its own interests or to avoid a loss. John Downes is a senior claims counsel for Fidelity and he, along with Fidelity's claim management team, made the decision to honor the bonds. Downes testified that Fidelity's attorneys met with outside counsel and determined that Fidelity was legally obligated to honor the bonds. He testified the sole reason Fidelity affirmed its obligation under the bonds was that it concluded it was legally obligated to honor them. Also, asked if Flagstaff threatened to sue Fidelity, Downes responded that it was "said a little bit differently if my recollection is correct ... But I think it was more in a connection with an actual demand to perform."

¶ 33 This testimony supports the conclusion that Fidelity was acting to protect its interests and minimize any loss. Fidelity believed that it was legally obligated to honor the bonds and Flagstaff had at least implied

---

**2.** Bondwriter asserts that the evidence does not support the court's findings that subcontractors threatened to walk off the job if they were not paid and that liquidated damages would be assessed for the delay. Because we do not base our conclusion on those particular findings, we need not address whether the findings are supported by the record.

that it would sue Fidelity if it did not pay the claims. By honoring the bonds, Fidelity was avoiding the time and expense of possible litigation and also protecting its reputation, image, and relationship with Flagstaff.

¶ 34 Bondwriter contends that Fidelity did not act to protect its interests or to avoid a loss because if it had denied payment and Flagstaff had sued, a court would have found that the copied bonds were not valid. But this argument assumes that in order to avoid ratification, the principal's actions must *actually* protect its interest or *actually* avoid a loss. We understand the respective versions of the Restatement to focus on the principal's motivation for acting, not the eventual outcome of the acts. Put differently, the Restatements do not require the principal's actions to produce a particular outcome, as long as in acting, the principal intended to protect its interest or avoid a loss. *See* Restatement (Second) of Agency § 101(b) ("Ratification is not effective ... if the principal is obliged to affirm in order to protect his own interests."); Restatement (Third) of Agency § 4.02(2)(b) ("Ratification is not effective ... when the principal ratifies to avoid a loss.").

¶ 35 Bondwriter also cites *Foley Co. v. Scottsdale Ins. Co.*, 28 Kan.App.2d 219, 15 P.3d 353 (2000), and *Philips Indus., Inc. v. Mathews, Inc.*, 711 P.2d 704 (Colo.Ct.App. 1985), in support of its argument that Fidelity ratified Bondwriter's breaches. In both of those cases, however, the principal received, or attempted to receive, a benefit from the agent's unauthorized actions and attempted to repudiate only after it became likely it would suffer a loss as a result of the agent's actions. *See Foley*, 15 P.3d at 357; *Philips*, 711 P.2d at 706. Here, Bondwriter does not allege and the record does not indicate that Fidelity received premiums from Adaptive or benefited in any way from Bondwriter's unauthorized actions.

## Bondwriter Breached The Agency Agreement And The Power Of Attorney Agreement

¶ 36 Bondwriter contends that it did not breach the agency agreement or the power of attorney agreement because the Flagstaff Project bonds were never legally executed.

According to Bondwriter, the only way it could have breached the agency and power of attorney agreements was if it *executed* a bond without Fidelity's authority. Bondwriter argues that "execution" of a bond is a term of art that requires delivery of the bond to the obligee, which in this case is Flagstaff. Based upon the court's pretrial ruling, *see supra* ¶ 15 and A.R.S. § 34–222, Bondwriter argues that a valid delivery requires the original bonds to be delivered to the obligee. There was no execution here, argues Bondwriter, because the original bonds were never delivered to Flagstaff.

¶ 37 On this basis, Bondwriter asserts the court erred by not granting its motion for summary judgment and its motion for judgment as a matter of law, and by not ultimately ruling in its favor on Fidelity's contract claim. We review these rulings de novo. *See Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 482, ¶ 13, 38 P.3d 12, 20 (2002) (motion for summary judgment); *Trustmark Ins. Co. v. Bank One, Ariz., NA*, 202 Ariz. 535, 541, ¶ 30, 48 P.3d 485, 491 (App.2002) (motion for judgment as a matter of law); *Grosvenor Holdings, L.C. v. Figueroa*, 222 Ariz. 588, 593, ¶ 9, 218 P.3d 1045, 1050 (App.2009) ("[T]he interpretation of a contract is a question of law, which this court reviews de novo.").

¶ 38 As previously noted, the agency agreement between Fidelity and Bondwriter provided in relevant part:

EIGHTEENTH Nothing herein contained shall be considered or construed as authorizing Agent or any of its employees or subagents to represent the Company for any lines or types of bonds or policies except those which are specifically authorized by Company to Agent, its employees, and/or sub-agents, through any Specific Authorization incorporated herein. Agent shall be responsible for all acts of its employees, and/or sub-agents.

\*       \*       \*

NINETEENTH The authority of Agent shall extend no further than is expressly

stated in this Agreement and attachments hereto.

The power of attorney agreement was attached to the agency agreement. This document provided in part that:

> Unless specifically authorized in a separate Line of Authority Agreement for a specified surety account(s), all construction and supply bonds, whether bid, performance or payment, or any bond guaranteeing the performance or completion of a contract, or any other bond rated in the contract section of the surety note manual, must be submitted to your branch for approval and specific authority obtained before the bond is executed *or a commitment is given.*

(Emphasis added.)

¶ 39 Based upon this language from the agreements, we disagree with Bondwriter's assertion that it could only breach the agreements by "executing" a bond without Fidelity's authority. The power of attorney agreement required Bondwriter to obtain authority from Fidelity "before the bond is executed *or a commitment is given.*"

¶ 40 It is undisputed that Stanton, on behalf of Fidelity but without Fidelity's authorization, prepared and signed the Flagstaff Project bonds for Adaptive and gave the bonds to Sparks, who then delivered the bonds to Adaptive. Through these actions, Bondwriter extended unauthorized bond commitments on behalf of Fidelity to Adaptive, in breach of the agreements.

¶ 41 Bondwriter argues that it never gave a commitment to Adaptive; rather, it informed Adaptive by e-mail that the bonds would not be issued without further information. Regardless of what Bondwriter had initially communicated to Adaptive, by preparing, signing, and delivering the bonds it communicated a commitment to Adaptive on the Flagstaff Project bonds. Accordingly, the trial court did not err in concluding that Bondwriter breached the agreements and it correctly denied Bondwriter's motions for summary judgment and for judgment as a matter of law.[3]

### The Court Did Not Err In Awarding Damages To Fidelity On Its Contract Claim

¶ 42 Bondwriter contends that Fidelity should not have been awarded any damages under its contract claim because its damages were not foreseeable and could have been avoided or mitigated.

¶ 43 Bondwriter did not raise foreseeability in the superior court, and we usually deem such unasserted arguments to be waived. *See Odom v. Farmers Ins. Co. of Ariz.,* 216 Ariz. 530, 535, ¶ 18, 169 P.3d 120, 125 (App. 2007) ("[A]rguments raised for first time on appeal are untimely and generally deemed waived.").

¶ 44 Even if not waived, the damages sustained by Fidelity were foreseeable as a result of the breach. Under Arizona law, any damage resulting from a breach of contract must either "arise naturally from the breach itself or ... [must] reasonably be supposed to have been within the contemplation of the parties at the time they entered the contract." *All Am. Sch. Supply Co. v. Slavens,* 125 Ariz. 231, 233, 609 P.2d 46, 48 (1980). Here, Bondwriter breached its contracts with Fidelity by issuing unauthorized bonds. A natural consequence of issuing bonds is that claims may be made on the bonds, requiring the obligor to pay the claims. Accordingly, the damages Fidelity sustained by honoring the claims on the bonds were foreseeable.

¶ 45 Bondwriter also asserts that the court should not have awarded Fidelity contract damages because Fidelity did not act to mitigate or avoid the loss resulting from Bondwriter's breach. "A basic principle of the law of damages is that one who claims to have been injured by a breach of contract must use reasonable means to avoid or minimize the damages resulting from the breach." *W. Pinal Family Health Ctr., Inc. v. McBryde,* 162 Ariz. 546, 548, 785 P.2d 66, 68 (App.1989). The Restatement (Second) of Contracts § 350 (1981) provides that "dam-

---

3. Because our determination does not depend upon whether Bondwriter "executed" the bonds, we do not address what constitutes "execution" of a bond or whether A.R.S. § 34–222 required Flagstaff to possess the original bonds in order to make a valid claim on them.

ages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation." That section also provides that the injured party is not precluded from recovery to the "extent that he has made reasonable but unsuccessful efforts to avoid loss."

¶ 46 The court permissibly concluded that Fidelity acted reasonably in paying claims on the bonds. Fidelity made reasonable efforts to avoid or minimize the loss by consulting with its legal department and outside counsel to determine if it was liable on the bonds. Once Fidelity determined that it was legally obligated on the bonds, it was not required to refuse Flagstaff's claims and subject itself to the risk of legal exposure, the potential burden of costly litigation, and possible loss of reputation amongst its customers.

¶ 47 Bondwriter asserts, however, that because Flagstaff could not have made a valid claim without the original bonds, substantial grounds existed to deny its claims without "undue risk, burden or humiliation." Bondwriter argues that Fidelity came to the conclusion that it was liable on the bonds by "guessing incorrectly." We disagree with this argument for the following reasons. Fidelity's legal counsel met with outside counsel and concluded that it was legally obligated on the bonds. It did not merely "guess," as Bondwriter suggests. Also, we do not think that the consequences of "guessing incorrectly"—using Bondwriter's phrase—should fall upon a surety that honors obligations it might possibly have been able to avoid by pursuing litigation. Finally, because Fidelity obtained legal advice regarding the validity of the bonds, it was not unreasonable for Fidelity to decide not to resist payment and file a declaratory judgment action, as Bondwriter suggests Fidelity should have done.

¶ 48 Bondwriter also asserts that, once the bonds were retrieved and cancelled, Fidelity could have avoided all of its damages by informing Flagstaff that the bonds were mistakenly issued. The primary problem with this argument is that Fidelity did not know that copies of the bonds had been made by Adaptive and presented to Flagstaff. Furthermore, Bondwriter itself could have inves-

tigated to determine if Adaptive had made copies and submitted them to Flagstaff.

¶ 49 On this record, we conclude that Fidelity is not precluded from recovering damages from Bondwriter for its breach of contract.

### Bondwriter's Arguments Regarding Fidelity's Negligence Claim

¶ 50 Bondwriter raises several issues regarding Fidelity's negligence claim. The trial court issued a single judgment in favor of Fidelity against Bondwriter rather than separate judgments based on negligence and breach of contract. Because we affirm the court's ruling in favor of Fidelity on its breach of contract claim, we need not reach Bondwriter's arguments relating solely to the negligence claim.

### CONCLUSION

¶ 51 We affirm the court's ruling in favor of Fidelity on its breach of contract claim. We vacate the court's damages award and the attorneys' fees award, and we remand this matter to the trial court for a redetermination of the attorneys' fees award, for entry of a revised judgment in favor of Fidelity, and for any other appropriate proceedings consistent with this opinion.

¶ 52 Fidelity requests an award of its attorneys' fees on appeal. Section 12–341.01(A), A.R.S., provides that we may award reasonable attorneys' fees to the successful party in an action arising out of contract. In the exercise of our discretion, we will award an amount of reasonable attorneys' fees to Fidelity upon its compliance with Arizona Rule of Civil Appellate Procedure 21(c). Fidelity is also entitled to recover its taxable costs on appeal.

CONCURRING: DIANE M. JOHNSEN, Presiding Judge, and MICHAEL J. BROWN, Judge.