2012 COA 120

**CORE–MARK MIDCONTINENT, INC.; Core–Mark International, Inc.; United States Fire Insurance Company; and Commonwealth Insurance Company, Plaintiffs–Appellees,**

v.

**SONITROL CORPORATION, Defendant–Appellant.**

**Nos. 10CA2289, 11CA0369.**

Colorado Court of Appeals, Div. I.

July 19, 2012.

Davis Graham & Stubbs LLP, Andrew M. Low, Kyle W. Brenton, Denver, Colorado, for Plaintiffs–Appellees.

Sander, Ingebretsen, & Wake, P.C., Richard G. Sander, S. Kirk Ingebretsen, Christopher Noecker, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge J. JONES.

¶ 1 Defendant, Sonitrol Corporation, appeals the judgment entered against it after a jury trial on the breach of contract claims of plaintiffs, Core–Mark International, Inc. and its wholly owned subsidiary, Core–Mark Midcontinent, Inc. (collectively, Core–Mark); and Core–Mark's casualty insurers, United States Fire Insurance Company and Commonwealth Insurance Company (collectively, the Insurers). It also appeals the district court's award of costs based on that judgment. We affirm the judgment as to liability, reverse the judgment as to damages, vacate the costs award, and remand the case for a new trial on damages.

## I. Background

¶ 2 Sonitrol and Core–Mark contracted to have Sonitrol install and monitor a burglar alarm system at one of Core–Mark's warehouses. Section 12.C of the contract purported to limit Sonitrol's liability as follows:

[CORE–MARK] UNDERSTANDS AND AGREES THAT IF [SONITROL] SHOULD BE FOUND LIABLE FOR ANY LOSS OR DAMAGES DUE FROM

A FAILURE TO PERFORM ANY OF ITS OBLIGATIONS OR A FAILURE OF THE EQUIPMENT TO PROPERLY OPERATE, [SONITROL]'S LIABILITY SHALL BE LIMITED TO A SUM EQUAL TO THE TOTAL OF ONE-HALF YEAR'S MONITORING PAYMENTS, OR FIVE HUNDRED DOLLARS ($500) WHICHEVER IS THE LESSER, AND THIS LIABILITY SHALL BE EXCLUSIVE AND SHALL APPLY IF LOSS OR DAMAGE, IRRESPECTIVE OF CAUSE OR ORIGIN, RESULTS DIRECTLY OR INDIRECTLY TO PERSONS OR PROPERTY FROM PERFORMANCE OR NON-PERFORMANCE OF ANY OF [SONITROL]'S OBLIGATIONS OR FROM NEGLIGENCE, ACTIVE OR OTHERWISE, OF [SONITROL], ITS EMPLOYEES OR AGENTS.

¶ 3 In December 2002, Sonitrol failed to detect or to respond to a burglary at the warehouse. One of the burglars, David Ottersberg, started a fire in the warehouse that effectively destroyed the building and its contents.

¶ 4 Core–Mark recovered part of its losses from the Insurers, and it then sued Sonitrol to recover its uninsured losses. The Insurers separately sued Sonitrol in a subrogation action to recover the insured losses. Both plaintiffs asserted tort and breach of contract claims. The cases were consolidated.

¶ 5 Sonitrol moved to dismiss the tort claims based on the economic loss rule and, as relevant here, moved for summary judgment on the breach of contract claims to the extent those claims sought damages in excess of those permitted under Section 12.C of the contract. The district court granted both motions. Core–Mark and the Insurers then voluntarily dismissed the breach of contract claims to the extent the court had not previously dismissed them.

¶ 6 On appeal, a division of this court affirmed the dismissal of the tort claims, but held that the district court had erred by determining that Sonitrol's claims for willful and wanton breach of contract were subject to the limitation of liability in Section 12.C. *United States Fire Ins. Co. v. Sonitrol Mgmt. Corp.*, 192 P.3d 543, 548–49 (Colo. App.2008) (*Sonitrol I*). Because there was a genuine issue of material fact as to whether Sonitrol's actions were willful and wanton, the division reversed the summary judgment on the breach of contract claims and remanded the case for further proceedings. *Id.* at 549–50.

¶ 7 On remand, a jury found in plaintiffs' favor on their claims for willful and wanton breach of contract and willful and wanton breach of the contractual duty of good faith and fair dealing, and awarded Core–Mark $7,348,732 and the Insurers $10,965,777.[1]

## II. Discussion

¶ 8 On appeal, Sonitrol contends that the division in *Sonitrol I* erred by ruling that a limitation of liability provision like that here is not enforceable where a party has committed a willful and wanton breach of contract. It also contends that the district court erred on remand by refusing to allow Sonitrol's expert witnesses to testify and by striking Sonitrol's designation of Mr. Ottersberg as a nonparty at fault. We reject Sonitrol's contentions regarding the decision in *Sonitrol I* and Mr. Ottersberg. However, we agree with Sonitrol that the district court abused its discretion by refusing to allow its experts to testify, and conclude that the error was not harmless.

### A. Enforceability of Liability Limitation Provision

#### 1. Law of the Case

¶ 9 Before reaching the merits of Sonitrol's contention, we must consider whether it is appropriate for us to reexamine the prior division's ruling.

¶ 10 When an appellate court rules on an issue in a case, that ruling becomes the law of the case. *People v. Roybal*, 672 P.2d 1003, 1005 (Colo.1983); *Ferrel v. Colo. Dep't of Corr.*, 179 P.3d 178, 184 (Colo.App.2007). The law of the case doctrine generally re-

---

1. The district court added prejudgment interest to the awards and entered judgment in the amounts of $15,589,964 for Core–Mark and $17,490,255 for the Insurers.

quires a court to follow its prior relevant rulings in the case. *Giampapa v. Am. Family Mut. Ins. Co.*, 64 P.3d 230, 243 (Colo. 2003). However, the doctrine "is merely discretionary when applied to a court's power to reconsider its own prior rulings." *Id.*; see also *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) ("[T]he law-of-the-case doctrine 'merely expresses the practice of courts generally to refuse to reopen what has been decided, [and is] not a limit to their power.'... A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances ...." (citation omitted) (quoting in part *Messinger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912))). Thus, a division of this court may review another division's ruling in the same case where "the previous decision is no longer sound because of changed conditions or law, or legal or factual error, or if the prior decision would result in manifest injustice." *Vashone–Caruso v. Suthers*, 29 P.3d 339, 342 (Colo.App.2001); accord *Saint John's Church in the Wilderness v. Scott*, 2012 COA 72, ¶ 9, 296 P.3d 273; see also *Giampapa*, 64 P.3d at 243.

■ ¶ 11 Here, Sonitrol contends that the *Sonitrol I* division's ruling was legal error and resulted in manifest injustice. Specifically, Sonitrol argues that the prior division's ruling ignored the distinction between tort and contract claims and failed to consider numerous decisions from other jurisdictions enforcing limitation of liability clauses such as the one at issue here. Because legal error is an exception to the law of the case doctrine, and because the law in this particular area involves relatively subtle, but nonetheless meaningful, distinctions that are sometimes misunderstood, we choose to reach the merits of Sonitrol's contention.[2]

**2.** We emphasize that a party's mere assertion of legal error does not *require* a division of this court to revisit another division's prior ruling. As noted, whether to do so is a matter entrusted to the division's discretion.

### 2. Analysis

■ ¶ 12 Sonitrol does not challenge the sufficiency of the evidence of willful and wanton breach of contract.[3] It does, however, challenge the award of damages by asking us to revisit the division's holding in *Sonitrol I* that a limitation of liability provision is not enforceable to limit the damages recoverable for willful and wanton breach of contract.

■ ¶ 13 A limitation of liability provision is generally enforceable because it represents the parties' bargained-for agreement regarding allocation of risks and costs in the event of a breach or other failure of the contemplated transaction. *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l Inc.*, 84 N.Y.2d 430, 618 N.Y.S.2d 882, 643 N.E.2d 504, 507 (1994); see *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1262 (Colo.2000) ("Contract law is intended to enforce the expectancy interests created by the parties' promises so that they can allocate risks and costs during their bargaining."); Restatement (Second) of Contracts § 195 cmt. a (1981). As with other contract provisions, however, a limitation of liability provision is not enforceable if, for example, it is contrary to public policy or unconscionable. See *Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186, 1191 (Colo.App.2008) (exculpatory clause); see also *Meyerstein v. City of Aspen*, 282 P.3d 456, 462–63 (Colo.App.2011) (a contract provision that violates public policy is void).

¶ 14 Courts in other jurisdictions have routinely upheld limitation of liability provisions in contracts for the installation and servicing of burglar alarm systems, even in actions premised on system failure. See, e.g., *Leon's Bakery, Inc. v. Grinnell Corp.*, 990 F.2d 44, 48 (2d Cir.1993) (applying Connecticut law) (collecting cases); *E.H. Ashley & Co., Inc. v. Wells Fargo Alarm Servs.*, 907 F.2d 1274, 1278 (1st Cir.1990) (applying Rhode Island law) ("Courts ... have repeatedly upheld limitation of liability clauses in burglar alarm service contracts against allegations that they are violative of public policy or uncon-

**3.** The evidence of this conduct is described in *Sonitrol I*, 192 P.3d at 546.

scionable."); *see also University Hills Beauty Academy, Inc. v. Mountain States Tel. & Tel. Co.*, 38 Colo.App. 194, 196, 554 P.2d 723, 725 (1976) (a limitation of liability provision in a services contract is generally valid if it was fairly made and the breaching party has no duty to the public). The courts reason that

> "[m]ost persons, especially operators of business establishments, carry insurance for loss due to various types of crime. Presumptively insurance companies who issue such policies base their premiums on their assessment of the value of the property and the vulnerability of the premises. No reasonable person could expect that the provider of an alarm service would, for a fee unrelated to the value of the property, undertake to provide an identical type [of] coverage should the alarm fail to prevent a crime."

*Leon's Bakery*, 990 F.2d at 48–49 (quoting *Guthrie v. Am. Protection Indus.*, 160 Cal. App.3d 951, 206 Cal.Rptr. 834, 836 (1984)); *accord Rassa v. Rollins Protective Servs. Co.*, 30 F.Supp.2d 538, 545 (D.Md.1998) (" 'It would be unreasonable to expect appellant to assume the responsibilities arising under a burglary insurance policy upon payment of ... th[e] nominal [monthly burglar alarm services] fee.' " (quoting *Vallance & Co. v. De Anda*, 595 S.W.2d 587, 590 (Tex.Civ.App. 1980))). Rather, because the probability a burglary will occur and the potential loss the property owner may suffer depend largely on the value of the property the owner chooses to retain on the guarded premises, courts consider the owner best able to determine what amount of insurance is necessary and to negotiate an appropriate insurance rate. *Leon's Bakery*, 990 F.2d at 48–49; *E.H. Ashley*, 907 F.2d at 1278–79; *Ostalkiewicz v. Guardian Alarm*, 520 A.2d 563, 565–66 (R.I. 1987).[4] Were an alarm service provider not permitted to limit its liability, it effectively would become an insurer of the property,

and might be discouraged from providing the service or be unable to provide it at an affordable price. *Leon's Bakery*, 990 F.2d at 49; *Champion Home Builders Co. v. ADT Sec. Servs., Inc.*, 179 F.Supp.2d 16, 23–24 (N.D.N.Y.2001) (applying New York law).

¶ 15 Though a limitation of liability provision in a burglar alarm system contract is thus generally enforceable, courts in other jurisdictions have recognized certain exceptions. One exception is that such a provision does not apply to conduct that is willful and wanton. *E.g., ADT Sec. Servs., Inc. v. Swenson*, 276 F.R.D. 278, 301 (D.Minn.2011) (applying Minnesota law); *Fed. Ins. Co. v. Honeywell, Inc.*, 641 F.Supp. 1560, 1562 (S.D.N.Y.1986) (applying New York law). This exception often is applied where the willful and wanton conduct is pled in the context of a tort claim. *E.g., Morgan Co. v. Minnesota Mining & Mfg. Co.*, 310 Minn. 305, 246 N.W.2d 443, 447–48 (1976). But a number of courts also have applied the exception to claims of willful and wanton breach of contract. *Honeywell, Inc. v. Ruby Tuesday, Inc.*, 43 F.Supp.2d 1074, 1079–80 (D.Minn.1999) (applying Alabama and Minnesota law) (because an exculpatory clause cannot release a party from liability for willful or wanton acts, a limitation of liability clause also does not apply to such acts); *Lenny's, Inc. v. Allied Sign Erectors, Inc.*, 170 Ga. App. 706, 318 S.E.2d 140, 142 (1984); *see Campmor, Inc. v. Brulant, LLC*, 2011 WL 2745922, *6 (D.N.J. No. 09–5465(WHW), July 12, 2011) (unpublished opinion) (applying Ohio law) (a limitation of liability provision will be upheld " 'so long as the party invoking the provision has not committed a wil[l]ful or reckless breach' " (quoting *Nahra v. Honeywell, Inc.*, 892 F.Supp. 962, 969–70 (N.D.Ohio 1995))); *cf. Onconome, Inc. v. University of Pittsburgh*, 2010 WL 1133425, *3 (W.D.Pa. No. 09cv1195, Mar. 23, 2010) (unpublished memorandum opinion and order) (applying

---

4. Indeed, Section 12.A of the contract here provides:

> It is understood and agreed by the parties that [Sonitrol] is not an insurer and that insurance, if any, covering personal injury and property loss or damages on [Core–Mark]'s premises shall be obtained by [Core–Mark], at [Core–Mark]'s sole expense; ... [and] that [Sonitrol]

> makes no guarantee, representation or warranty including any implied warranty of merchantability or fitness for particular purpose that the system or service supplied will avert or prevent occurrences or the consequences therefrom which the system or service is intended to detect or avert....

Pennsylvania law) (applying exception to breach of a research contract); *AGIP Petroleum Co., Inc. v. Gulf Island Fabrication, Inc.,* 920 F.Supp. 1330, 1345 (S.D.Tex.1996) (applying Louisiana law) (product fabrication agreement); *Hosiery Corp. of Am., Inc. v. Int'l Data Processing, Inc.,* 1991 WL 30015, *12–13 (D.N.J. No. Civ.A.89–115, Feb. 28, 1991) (unpublished opinion) (applying New Jersey law) (exculpatory clause does not apply to a willful and wanton breach of contract claim; concluding that the distinction between willful and wanton breach of contract and tort claims was irrelevant to determining whether the exculpatory clause applied); *Southworth & McGill, P.A. v. S. Bell Tel. & Tel. Co.,* 580 So.2d 628, 633–34 (Fla.Dist.Ct. App.1991) (exculpatory clause in a telephone directory contract); *but see Rent–All Shops, Inc. v. Bellsouth Adver. & Publ'g Corp.,* 849 F.2d 606, 1988 WL 60581, *1–2 (4th Cir. No. 87–1119, Mar. 11, 1988) (unpublished table opinion) (per curiam) (applying South Carolina law) (affirming without explanation the district court's rejection of the argument that a willful breach of contract barred enforcement of a limitation of liability clause in part because the clause was voidable only for unconscionability); *LDCircuit, LLC v. Sprint Commc'ns Co., L.P.,* 364 F.Supp.2d 1246, 1258 (D.Kan.2005) (applying Kansas law) (the rule that a provision limiting liability for willful or wanton conduct is unenforceable applies only to tort claims; whether the provision is enforceable in a breach of contract action depends on whether the provision is "fairly and knowingly entered into and not illegal, unconscionable, or contrary to public policy").[5]

¶ 16 The reason for refusing to allow limits on liability for a willful and wanton breach of contract concerns the nature of that conduct. "Willful and wanton conduct is purposeful conduct committed recklessly that exhibits an intent consciously to disregard the safety of others. Such conduct extends beyond mere unreasonableness." *Forman v. Brown,* 944 P.2d 559, 564 (Colo.App.1996) (citing *Terror Mining Co., Inc. v. Roter,* 866 P.2d 929, 933 (Colo.1994)); *see also New Light Co., Inc. v. Wells Fargo Alarm Servs.,* 247 Neb. 57, 525 N.W.2d 25, 30 (1994); *Tessler & Son, Inc. v. Sonitrol Sec. Sys. of N. New Jersey, Inc.,* 203 N.J.Super. 477, 497 A.2d 530, 533 (N.J.Super.Ct.App.Div.1985); *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.,* 192 A.D.2d 83, 600 N.Y.S.2d 212, 216 (1993), *aff'd,* 84 N.Y.2d 430, 618 N.Y.S.2d 882, 643 N.E.2d 504 (1994); *cf.* § 13–21–102(*l*)(b), C.R.S.2011 (defining willful and wanton conduct for purposes of awarding exemplary damages in a tort action). Because of the egregiously wrongful nature of the conduct, enforcing a limitation of liability provision to shield a party from the consequences of such conduct is deemed to be contrary to public policy. *See New Light Co.,* 525 N.W.2d at 30–31 (balancing the right to contract freely against the interest in protecting the public, and concluding that a provision insulating a party from damages caused by its willful and wanton conduct is against public policy because such reckless conduct has a tendency to be injurious to the public); *see also Tide Natural Gas Storage I, L.P. v. Falcon Gas Storage Co., Inc.,* 2011 WL 4526517, *6 (S.D.N.Y. No. 10 Civ. 5821, Sept. 29, 2011) (unpublished opinion and order) (applying New York law). Moreover, limiting liability for "[a] willful failure to monitor th[e] system or a deliberate disregard of a contractual duty would not be consistent with the intended protection service set forth in the contract." *Carriage Meat Co., Inc. v. Honeywell, Inc.,* 442 So.2d 796, 798 (La.Ct.App.1983) (concluding that an exculpatory clause would not shield the defendant "if personnel failed to notify [the] plaintiff during many hours of the alarm's being triggered"; considering a tort action).

5. Some courts have analogously held that a limitation of liability provision is inapplicable to claims of gross negligence. *See* Marjorie A. Shields, Annotation, *Validity, Construction, and Application of Exculpatory and Limitation of Liability Clauses in Burglary, Fire, and Other Home and Business Monitoring Service Contracts,* 36 A.L.R.6th 305, § 14 (2008) (collecting cases). Core–Mark pled a claim for gross negligence in its initial complaint, but the district court dismissed that claim, and Core–Mark tried only its willful and wanton breach of contract claims. Core–Mark has not appealed the dismissal of its gross negligence claim. Thus, to the extent Core–Mark suggests that the limitation of liability clause does not apply here because Sonitrol's actions were grossly negligent, we conclude that it has abandoned this argument.

¶ 17 We reject Sonitrol's contention that refusing to enforce a limitation of liability provision in the context of a claim for willful and wanton breach of contract improperly blurs the distinction between tort and contract law.

¶ 18 It is true that the concept of liability for willful and wanton conduct arises most frequently in the context of tort law. *E.g., Pham v. State Farm Mut. Auto. Ins. Co.,* 70 P.3d 567, 571 (Colo.App.2003) (claim for willful and wanton breach of an insurance contract is a tort claim); *Metropolitan Life Ins. Co.,* 600 N.Y.S.2d at 216. However, the rule that a contract provision is void if it is contrary to public policy is well-established. *F.D.I.C. v. Am. Cas. Co.,* 843 P.2d 1285, 1290 (Colo.1992); *see Equitex, Inc. v. Ungar,* 60 P.3d 746, 750 (Colo.App.2002). And numerous Colorado appellate decisions have held that a contract provision relieving a party from liability for its own willful and wanton conduct is against public policy. *Constable v. Northglenn, LLC,* 248 P.3d 714, 716–17 (Colo.2011) (public policy precludes agreements indemnifying a party for damages resulting from its own intentional or willful wrongful acts); *Jones v. Dressel,* 623 P.2d 370, 376 (Colo.1981) ("in no event will [an exculpatory] agreement provide a shield against a claim for willful and wanton negligence"); *Rhino Fund,* 215 P.3d at 1191 (most courts will not enforce exculpatory or limiting provisions that "purport to relieve parties from their own willful, wanton, reckless, or intentional conduct"); *Barker v. Colo. Region–Sports Car Club of Am., Inc.,* 35 Colo.App. 73, 80, 532 P.2d 372, 377 (1974) (same as *Jones* ).

¶ 19 Further, and in any event, Colorado recognizes an action for willful and wanton breach of contract, and permits a party to recover noneconomic damages [6] in such an action, even outside of the insurance context. *See Decker v. Browning–Ferris Indus. of Colo., Inc.,* 931 P.2d 436, 447–48 (Colo.1997) (willful and wanton breach of an employment contract); *Denver Publ'g Co. v. Kirk,* 729 P.2d 1004, 1009 (Colo.App.1986) (newspaper distribution agreement), *abrogated on other grounds by Mortg. Fin., Inc. v. Podleski,* 742 P.2d 900 (Colo.1987); *Smith v. Hoyer,* 697 P.2d 761, 764 (Colo.App.1984) (loan agreement); *see also Giampapa,* 64 P.3d at 238–40 (discussing the history and basis for the rule that noneconomic damages are awardable for a willful and wanton breach of contract).[7] This theory of recovery does not sound in tort but instead "adhere[s] to basic contract law principles." *Giampapa,* 64 P.3d at 240.

¶ 20 Therefore, we conclude that the division's ruling in *Sonitrol I* was correct.

## B. Expert Testimony

### 1. Background

¶ 21 Before trial, Sonitrol deposed or obtained the reports of three persons whom it intended to call as expert witnesses to testify concerning Core–Mark's alleged storage of an excessive amount of hazardous, flammable liquids in the warehouse and its alleged failure to store those liquids safely.

¶ 22 Carroll Pruitt, an architect, opined in his report that:

- Core–Mark had stored a windshield washer concentrate in the warehouse that was 99.8 percent methanol;
- though the applicable building and fire codes permitted no more than 120 gallons of that type of product to be stored in the warehouse (as it was configured before the fire), Core–Mark had stored more than 3,000 gallons there;
- the fire code required that certain containment measures be taken to store properly the volume of that class of liquid Core–Mark had chosen to store at the site, and those measures had not been taken;

---

6. Exemplary damages, however, are not recoverable. *Mortg. Fin., Inc. v. Podleski,* 742 P.2d 900, 902–05 (Colo.1987).

7. Though, as Sonitrol points out, section 13–21–102.5(6)(a)(I), C.R.S.2011, now limits the circumstances in which noneconomic damages are awardable for willful and wanton breach of contract, it does not limit the types of contracts as to which a party may seek recovery for a willful and wanton breach of contract.

- a memorandum (which Core–Mark later introduced at trial) by an assistant fire marshall who had investigated the fire opining that storage of the flammable materials at the warehouse did not violate the fire code was incorrect; and
- the failure to comply with the building and fire codes was "a significant contributing factor to the fire loss." [8]

¶ 23 Ron Coker, a fire protection engineer, elaborated further on the alleged noncompliance with the fire code.[9] He also opined that the noncompliance was a "significant contributing factor[ ] to the fire loss."

¶ 24 Finally, Marshall Littleton, an expert in fire and explosives investigation, testified in his deposition, in relevant part, that:

- based on his discussion with a fire protection engineer, he had concluded that the warehouse's sprinkler system was designed for noncombustible items;
- the inadequate sprinkler system, combined with the way the fire had begun, prevented the system from effectively stopping the fire;
- had Mr. Ottersberg not used the methanol-based concentrate to start one fire, the fire would have been "substantially less dramatic"; and
- when the concentrate became involved in the fire, it "contributed significantly" thereto.

¶ 25 Core–Mark moved to exclude this testimony. It argued that because the experts did not know how much windshield washer concentrate had burned in the fire [10] and had not analyzed specifically (1) how the existing fire sprinkler system had actually functioned during the fire or (2) whether an upgraded system would have produced a different result, the experts could not establish the allegedly necessary causal connection between the volume of the concentrate and the spread of

the fire. Sonitrol responded that it did not have the burden of proving causation and that the testimony was admissible to show that the extent of the damages suffered was not reasonably foreseeable.

¶ 26 The district court excluded the testimony, concluding that it was "irrelevant and unreliable" and unsupported "by a scientific and/or technical analysis which supports opinions regarding the effect an upgraded fire sprinkler system or the effect that code violations would have had on the spread of the fire inside the warehouse."

2. Analysis

¶ 27 CRE 702 governs the admissibility of expert testimony. It provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

¶ 28 To be admissible under CRE 702, expert testimony must be both reliable and relevant. *Estate of Ford v. Eicher*, 250 P.3d 262, 266 (Colo.2011). To determine whether testimony meets these requirements, the court must consider whether: (1) the scientific, technical, or specialized principles underlying the testimony are reasonably reliable; (2) the expert is qualified to opine to the matter; (3) the expert testimony will be helpful to the jury; and (4) the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *Id.; accord People v. Rector*, 248 P.3d 1196, 1200 (Colo.2011). An expert need not testify with certainty on a matter for his testimony to be admissible; rather, "the fact . . . the witness cannot sup-

---

**8.** Mr. Pruitt also noted that the product safety report for the product recommended a foam-based suppression system because water is ineffective to stop fires involving that product (the warehouse had a water-based system). The court allowed Sonitrol to introduce the product safety report at trial.

**9.** Specifically, Mr. Coker said in his report that for the volume of hazardous liquid at issue, the

fire code required (1) a liquid storage room, which the warehouse did not have; and (2) a sprinkler system designed to provide a greater density of water per square foot than the one in place at the warehouse.

**10.** Though the experts did not know how much of the concentrate had burned in the fire, it was undisputed that some of it had.

port his or her opinion with certainty goes only to the weight to be given to the opinion and not to its admissibility." *Schultz v. Wells,* 13 P.3d 846, 853 (Colo.App.2000); *accord Schuessler v. Wolter,* 2012 COA 86, ¶ 73, — P.3d —, 2012 WL 1881002.

¶ 29 We review the district court's decision not to admit expert testimony for an abuse of discretion. *See Rector,* 248 P.3d at 1200; *Antolovich v. Brown Grp. Retail, Inc.,* 183 P.3d 582, 596 (Colo.App. 2007). We will not disturb the decision unless it is manifestly erroneous or based on an incorrect legal standard. *See Estate of Ford v. Eicher,* 220 P.3d 939, 942 (Colo.App.2008), *aff'd,* 250 P.3d 262 (Colo.2011); *see also Luster v. Brinkman,* 205 P.3d 410, 414 (Colo. App.2008). If we determine that the court abused its discretion, we will reverse only "if we can say 'with fair assurance' that the trial court's exclusion of that evidence 'substantially influenced the outcome of the case or impaired the basic fairness of the trial itself.'" *Bly v. Story,* 241 P.3d 529, 537 (Colo. 2010) (quoting in part *E–470 Pub. Highway Auth. v. 455 Co.,* 3 P.3d 18, 23 (Colo.2000)); *see* CRE 103(a); C.R.C.P. 61 (an error is harmless, and does not require reversal, unless it affects the parties' substantial rights).

### a. The District Court Abused Its Discretion by Excluding the Testimony

¶ 30 We conclude that the experts' testimony was relevant and admissible on the issue of damages.

¶ 31 Contract damages are recoverable only to the extent they "were the foreseeable result of a breach at the time the contract was made." *Giampapa,* 64 P.3d at 240. Although the test is an objective one, if the defendant did not have a reason to foresee that a particular loss was the probable result of a breach at the time of contracting, "[t]he mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable" does not make the defendant liable for the portion of the loss that was not foreseeable. Restatement (Second) of Contracts § 351 cmt. a (1981). The defendant must have had a reason to foresee both the type and the general

magnitude of damages. *Landmark Land Co., Inc. v. F.D.I.C.,* 256 F.3d 1365, 1378 (Fed.Cir.2001); 11 Joseph M. Perillo, *Corbin on Contracts* § 56.7, at 108 (rev. ed. 2005).

¶ 32 We assume that Sonitrol could have foreseen that if it failed to detect a break-in at the warehouse, a burglar could start a fire. However, the jury should have been able to consider Sonitrol's proffered expert testimony relating to whether Sonitrol could have foreseen that the fire set by Mr. Ottersberg would prove so calamitous due to the alleged code violations. *Cf. Sunnyland Farms, Inc. v. Cent. New Mexico Elec. Coop., Inc.,* 149 N.M. 746, 255 P.3d 324, 346 (N.M.Ct.App. 2011) (*cert. granted* May 17, 2011) (the trial court's refusal to reduce contract damages was not sustainable when it was clear the court believed that the plaintiff should have avoided or mitigated against the spread and magnitude of the fire).

¶ 33 Further, the proffered testimony supported Sonitrol's theory that its conduct was not the cause of all the damages Core–Mark claimed. In this regard, the district court incorrectly assumed that, to be admissible, the testimony at issue had to include an analysis of how the alleged code violations actually impacted the spread of the fire or precisely how the result would have differed under a compliant suppression system. Such a conclusive analysis is not required of expert testimony; rather, it is sufficient that the testimony permits the jury to infer the proposition for which it is offered. *See People v. Ramirez,* 155 P.3d 371, 381–82 (Colo.2007); *Hartford Fire Ins. Co. v. Pub. Serv. Co.,* 676 P.2d 25, 29 (Colo.App.1983); *see also Wackman v. Rubsamen,* 602 F.3d 391, 400 (5th Cir.2010); *DiCosolo v. Janssen Pharm., Inc.,* 2011 IL App (1st) 093562, 351 Ill.Dec. 574, 951 N.E.2d 1238, 1249–50 (2011). Here, though further explanation might have been more helpful to the jury, the jury could have inferred from the experts' testimony that storing more than twenty-five times the permissible amount of flammable liquid without taking appropriate precautionary measures resulted in the fire causing more damage than it would have otherwise—in short, that Sonitrol was not responsible for all the

damages plaintiffs sought. *See Ramirez*, 155 P.3d at 381–82; *cf. Nguyen v. Uniflex Corp.*, 312 S.C. 417, 440 S.E.2d 887, 889 (S.C.Ct.App.1994) (though there was "no evidence that the manner in which the chemicals were stored constituted the proximate cause of the fire, nevertheless, the jury may have premised its finding of negligence on its determination that the city ordinances relating to fire safety had been violated and their violation was the proximate cause of the fire"). Any doubts about the extent to which the code violations contributed to the fire's spread would have been "sufficiently addressed by vigorous cross-examination [and] presentation of contrary evidence, . . . rather than exclusion." *Estate of Ford*, 250 P.3d at 266; *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

¶ 34 The court also suggested that the experts were required to have performed a scientific or technical analysis for their testimony to be admissible. But an expert need only possess some specialized knowledge that would be helpful to the jury. Here, that knowledge concerned the applicable fire and building codes and fire safety recommendations. *See* CRE 702; *Gresham v. Petro Stopping Ctrs., LP*, 2011 WL 1042705, *4 (D.Nev. No. 3:09–cv–00034–RCJ–VPC, Mar. 18, 2011) (unpublished order) ("expert opinion need not be based on scientific expertise"); *Ji v. Bose Corp.*, 538 F.Supp.2d 354, 357 (D.Mass.2008) (specialized knowledge need not be scientific or technical); *see also People v. Davis*, 2012 COA 56, ¶¶ 43–47, 296 P.3d 219 (police detective's expert testimony concerning gang hierarchy, communication methods, and ideology was admissible specialized knowledge).

¶ 35 Therefore, we conclude that the district court abused its discretion by excluding Sonitrol's experts' testimony.

### b. The Error Was Not Harmless

¶ 36 We further conclude that the court's erroneous exclusion of the testimony was not harmless.

¶ 37 The court precluded Sonitrol from presenting expert testimony that Core–Mark had violated the fire code by storing so much flammable liquid at the warehouse and that the safety measures in place at the warehouse did not comply with building and fire codes for the amount of concentrate stored there. Core–Mark's witnesses, however, were allowed to testify that:

- there were no code provisions governing storage of hazardous materials at the warehouse;
- the warehouse had not been in violation of the fire code in any way that was significant with respect to the fire;
- the sprinkler system complied with code requirements;
- any flammable materials were stored in a manner consistent with the fire and building codes; and
- it was foreseeable that a forced entry into the warehouse could have led to the entire warehouse burning down.

¶ 38 Core–Mark's counsel reiterated in closing argument that one of Core–Mark's witnesses had testified that "Core–Mark complied with all of the building and fire codes," and emphasized that "it's significant that there's not anyone [who is not a former Sonitrol employee] who has testified on behalf of Sonitrol." [11]

¶ 39 In effect, the court did not allow the jury to hear testimony rebutting that of Core–Mark's witnesses on issues central to the determination of damages. Because the jury could have inferred from Sonitrol's experts' testimony that the loss from the fire would have been substantially less had Core–Mark or the warehouse owner complied with the alleged code requirements, we can say with fair assurance that the court's exclusion of the testimony substantially influenced the outcome, at least as to damages. *See Bly*, 241 P.3d at 537; *Estate of Ford*, 220 P.3d at 947 (exclusion of expert testimony was not harmless because it concerned the likely

---

11. At oral argument, Core–Mark's counsel suggested that its witnesses' testimony on this subject was irrelevant, and therefore testimony on the issue from Sonitrol's witnesses could not have been relevant. But Core–Mark did not take that position in the district court or in its briefs on appeal.

cause of the claimed injury and opposing counsel pointed out in closing argument that no defense witness had offered an alternative theory of causation).[12]

¶40 Therefore, we reverse the judgment as to damages and remand the case for a new trial on damages in which Sonitrol may present its expert testimony. We also vacate the costs award associated with the judgment.

## C. Designation of Nonparty at Fault

¶41 Sonitrol contends that the district court erred by ruling that it could not designate Mr. Ottersberg as a nonparty at fault under section 13–21–111.5, C.R.S.2011. We address this contention because it affects Sonitrol's potential liability on remand.

¶42 Sonitrol's contention presents a question of statutory interpretation. We review such a question de novo. *Hassler v. Account Brokers of Larimer Cnty., Inc.*, 2012 CO 24, ¶15, 274 P.3d 547.

¶43 In interpreting a statute, our primary goals are to discern and give effect to the General Assembly's intent. *Id.; L & R Exploration Venture v. Grynberg*, 271 P.3d 530, 533 (Colo.App.2011). We first look to the statutory language, giving the words and phrases used therein their plain and ordinary meanings. *Hassler*, ¶15; *L & R Exploration Venture*, 271 P.3d at 533. We read the language in the dual contexts of the statute as a whole and the comprehensive statutory scheme, giving consistent, harmonious, and sensible effect to all of the statute's parts. *Jefferson Cnty. Bd. of Equalization v. Gerganoff*, 241 P.3d 932, 935 (Colo.2010); *BP Am. Prod. Co. v. Patterson*, 185 P.3d 811, 813 (Colo.2008). After doing this, if we determine that the statute is not ambiguous, we enforce it as written and do not resort to other rules of statutory construction. *Denver Post Corp. v. Ritter*, 255 P.3d 1083, 1089 (Colo.2011); *Carruthers v. Carrier Access Corp.*, 251 P.3d 1199, 1203 (Colo.App.2010).

¶44 Section 13–21–111.5 addresses pro rata liability of defendants in civil actions. It provides, in relevant part:

(1) In an action brought as a result of a death or an injury to person or property, no defendant shall be liable for an amount greater than that represented by the degree or percentage of the negligence or fault attributable to such defendant that produced the claimed injury, death, damage, or loss, except as provided in subsection (4) of this section.

. . . .

(3)(a) Any provision of the law to the contrary notwithstanding, the finder of fact in a civil action may consider the degree or percentage of negligence or fault of a person not a party to the action . . . in determining the degree or percentage of negligence or fault of those persons who are parties to such action. . . .

. . . .

(4) Joint liability shall be imposed on two or more persons who consciously conspire and deliberately pursue a common plan or design to commit a tortious act. . . .

¶45 Before trial, Sonitrol moved to allow the jury to apportion liability to Mr. Ottersberg as a nonparty at fault under section 13–21–111.5(3). The district court denied the motion, reasoning in part that though the phrase "negligence or fault" in subsections (1) and (3) establishes that the statute does not apply to negligence actions alone, subsection (4)'s reference to a "tortious act" indicates that the section permits apportionment of liability only to a nonparty at fault in a tort action.

¶46 We agree with the district court's conclusion.

¶47 We observe initially that section 13–21–111.5 applies only to "an action brought as a result of a death or an injury to person or property." § 13–21–111.5(1). In interpreting similar language in another damages statute, the supreme court has held that the phrase "for a wrong done to the person, or to

---

12. Core–Mark and the Insurers contend that excluding the testimony was harmless error because Mr. Ottersberg testified that he would have purchased gasoline to start the fire if the concentrate had not been available. But that testimony was wholly irrelevant to the issue of the extent of the impact Core–Mark's alleged code violations might have had on the amount of damages the fire caused. And, in any event, we cannot assume that the jury believed Mr. Ottersberg.

personal or real property" refers to tortious conduct. *Mortg. Fin., Inc. v. Podleski,* 742 P.2d 900, 902 (Colo.1987) (interpreting section 13–21–102(1)(a), C.R.S.2011 (relating to exemplary damages)); *see also* § 13–21–111.6, C.R.S.2011 (governing reduction of damages for collateral source payments in "any action ... to recover damages for a tort resulting in death or injury to person or property"); *cf.* § 13–17–201, C.R.S.2011 (addressing the award of attorney fees in "all actions brought as a result of a death or an injury to person or property occasioned by the tort of any other person"). Consistently applying this interpretation, we read section 13–21–111.5 as also limited to tort actions. *See Stoorman v. Greenwood Trust Co.,* 908 P.2d 133, 135 (Colo.1995) ("Generally, similar language should be interpreted in the same manner....").

¶ 48 Further, as the district court recognized, the supreme court has interpreted the term "tortious act" in subsection 13–21–111.5(4) to "include[ ] any conduct *other than breach of contract* that constitutes a civil wrong and causes injury or damages." *Resolution Trust Corp. v. Heiserman,* 898 P.2d 1049, 1055 (Colo.1995) (emphasis added). Sonitrol contends that subsection (4) has no bearing on the interpretation of subsections (1) or (3) in this case. But in *Resolution Trust,* the supreme court rejected a party's argument that "the term 'tortious act' must mean something other than the phrase 'negligence or fault,'" the phrase used in subsections (1) and (3). *Id.* at 1056. Later, the court said that it had held in *Resolution Trust* that "'tortious act' did include 'negligence or fault,' ... [thereby] implicitly equat[ing] 'negligence or fault' with negligent and intentional acts." *Slack v. Farmers Ins. Exchange,* 5 P.3d 280, 286 (Colo.2000); *see also Redden v. SCI Colo. Funeral Servs., Inc.,* 38 P.3d 75, 80 (Colo.2001) ("Fault is broader than negligence, including, for example, intentional torts...."). Consequently, the holdings in *Resolution Trust* and *Slack* suggest that because a breach of contract is

not a tortious act, such a breach does not fall within the meaning of "fault" as used in subsections (1) and (3). *Cf. Fidelity & Deposit Co. of Maryland v. Bondwriter Sw., Inc.,* 228 Ariz. 84, 263 P.3d 633, 637 (Ariz.Ct. App.2011) (comparative fault statute did not authorize apportionment of damages on contract claim); *Lesmeister v. Dilly,* 330 N.W.2d 95, 101 (Minn.1983) (definition of fault in comparative fault statute was not intended to apply to contract cases in part because "contract law has never spoken in terms of fault; the contract measure of damages generally is based on recovery of the expectancy or benefit of the bargain").

¶ 49 Therefore, the district court did not err in ruling that Sonitrol could not designate Mr. Ottersberg as a nonparty at fault under section 13–21–111.5. *See Trustees of Colo. Laborers' Health & Welfare Trust Fund v. Am. Benefit Plan Adm'rs, Inc.,* 2005 WL 1661079, *2 (D.Colo. No. 04–CV–02630–EWN–OES, July 14, 2005) (unpublished magistrate judge order) (section 13–21–111.5 does not apply to contract-based claims).[13]

¶ 50 The judgment of liability is affirmed, the judgment as to damages is reversed, the order awarding costs is vacated, and the case is remanded for a new trial on the issue of Core–Mark's damages.

Judge RUSSEL and Judge VOGT * concur.

---

**13.** Because section 13–21–111.5 does not apply to the plaintiffs' breach of contract claims, we do not need to address Sonitrol's contention that the district court erred in ruling that Sonitrol could not designate Mr. Ottersberg as a nonparty at

fault because he was not a party to the contract and therefore owed no duty to Core–Mark.

\* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24–51–1105, C.R.S.2011.