24CA0483 Peo in Interest of JM

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA0483
El Paso County District Court No. 23JV30818
Honorable Lin Billings Vela, Judge

The People of the State of Colorado,

Appellee,

In the Interest of J.M., M.V., M.M., and P.M., Children,

and Concerning M.M.,

Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE JOHNSON
Lipinsky and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 20, 2025

Kenneth R. Hodges, County Attorney, Mathew Feldman, Deputy County
Attorney, Colorado Springs, Colorado, for Appellee

Josie L. Burt, Guardian Ad Litem, for J.M. and M.V.

Josie L. Burt, Counsel for Youth, Glenwood Springs, Colorado, for M.M. and
P.M.

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for
Appellant

¶ 1    In this dependency and neglect proceeding, M.M. (mother) appeals the juvenile court's judgment adjudicating her children dependent and neglected as to her following a jury trial. We affirm the judgment.

## I.    Background

¶ 2    The El Paso County Department of Human Services (the Department) filed a petition in dependency or neglect regarding fifteen-year-old P.M., twelve-year-old M.M., six-year-old M.V., and four-year-old J.M. The petition alleged that (1) mother was homeless and living in her vehicle with the children; (2) the children did not have access to food; (3) the children had not received recent medical care; and (4) the children had suffered physical abuse at the hands of mother. The petition further alleged that mother had a history of substance dependence and that the children had access to drugs and drugs paraphernalia while in her care.

¶ 3    The juvenile court conducted an adjudicatory jury trial and the jury returned verdicts finding that all children were dependent or neglected under section 19-3-102(a), (b), (c), (d), and (e), C.R.S. 2024. The jury additionally found that P.M. was dependent and neglected under section 19-3-102(f).

¶ 4    Following the jury trial, the juvenile court adjudicated the children dependent and neglected as to mother and adopted a treatment plan for mother.

## II.    ICWA

¶ 5    Mother first asserts that the juvenile court did not comply with the Indian Child Welfare Act (ICWA) of 1978, 25 U.S.C. §§ 1901-1963; § 19-1-126, C.R.S. 2024.  She contends that the court had "reason to know" the children were Indian children and, therefore, the Department should have provided notice of the adjudicatory trial to the Lakota and Apache tribes and treated the children as "Indian children" in the meantime.  We disagree.

### A.    Additional Facts

¶ 6    Mother filled out a form asserting that she was not an enrolled member of a tribe, but that the children were eligible for tribal membership.  Mother listed Lakota Sioux and Apache as the tribes the children were eligible to join.  At the adjudicatory trial, mother asserted that she was an enrolled member in "Lakota" and "Apache" tribes.  She informed the court that "the last step" she did to enroll the children was to "upload [the children's] birth certificates," but that she had not heard back from any tribe.  She told the court she

had provided her birth certificate to the tribes five years before the adjudication trial and had sent the children's birth certificates "recently once again" but had not heard back about enrollment. Mother did not provide an enrollment number or identification card for herself or any of the children or any other information indicating that the children were Indian children. Based on the foregoing, the juvenile court determined that mother had made "mere assertions" of heritage and, pursuant to *E.A.M.*, it therefore had no reason to know that the children were Indian children.

¶ 7 The court again addressed ICWA at the dispositional hearing. The Department informed the court that it had since sent notices to all Lakota Sioux and Apache tribes and that it had received responses from some of those tribes stating that the children were not Indian children. Mother's counsel notified the court that mother "may have received some additional tribal related documentation that hopefully we'll be able to provide to the parties" but did not explain what such documentation was. Nor does the record contain any additional documentation from mother.

## B. Standard of Review and Applicable Law

¶ 8    Whether the juvenile court and the Department complied with ICWA is a question of law that we review de novo. *People in Interest of T.M.W.*, 208 P.3d 272, 274 (Colo. App. 2009).

¶ 9    For ICWA to apply in a dependency and neglect proceeding, the case must involve an Indian child. *See People in Interest of A.G.-G.*, 899 P.2d 319, 321 (Colo. App. 1995). "Indian child" is defined as "any unmarried person who is under the age of eighteen" and is (1) "a member of an Indian tribe" or (2) "eligible for membership in an Indian tribe" and "the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(3); § 19-1-103(83), C.R.S. 2024. "Until the party asserting the applicability of the ICWA establishes, on the record, that the child meets one or both of these criteria, the ICWA is not applicable." *A.G.-G.*, 899 P.2d at 321.

¶ 10    In a dependency and neglect proceeding in Colorado, a juvenile court must inquire of the parties whether they know or have reason to know that a child is an Indian child. § 19-1-126(1)(a)(I)(A), C.R.S. 2024. Upon conducting the inquiry, the court has reason to know that the child is an Indian child if one of the following factors applies:

1. Any participant in the proceeding, officer of the court involved in the proceeding, Native tribe or organization, or agency informs the court that the child is an Indian child.

2. Any participant in the proceeding, officer of the court involved in the proceeding, Native tribe or organization, or agency informs the court that it has discovered information indicating that the child is an Indian child.

3. The child who is the subject of the proceeding gives the court reason to know he or she is an Indian child.

4. The court is informed that the domicile or residence of the child, the child's parent, or the child's Native custodian is on a reservation or in an Alaska Native village.

5. The court is informed that the child is or has been a ward of a Tribal court.

6. The court is informed that either parent or the child possesses an identification card indicating membership in a Tribe.

25 C.F.R. § 23.107(c) (2023); § 19-1-126(1)(a)(II).

¶ 11     "If the court knows or has reason to know" that the child is an Indian child, "the petitioning or filing party shall send notice by registered or certified mail, return receipt requested, to the parent or parents, the Indian custodian or Indian custodians of the child and to the tribal agent of the Indian child's tribe . . . ." § 19-1-126(1)(b).  "If there is reason to know the child is an Indian child but the court does not have sufficient evidence to determine that the child is or is not an Indian child," the court must "[t]reat the child as an Indian child, unless and until it is determined on the record that the child does not meet the definition of an Indian child." § 19-1-126(2)(b).

¶ 12     A mere assertion of Native heritage, without more, however, is insufficient to give the juvenile court reason to know that a child is an Indian child.  *People in Interest of E.A.M. v. D.R.M.*, 2022 CO 42, ¶ 56.  Rather, "these types of more generalized assertions of Indian heritage" only "trigger the due diligence requirement" in section 19-1-126(3).  *H.J.B. v. People in Interest of A-J.A.B.*, 2023 CO 48, ¶ 5.  Under those circumstances, section 19-1-126(3) requires the court to direct the department to "exercise due diligence in gathering

additional information that would assist the court in determining whether there is reason to know that the child is an Indian child."

## C.    Analysis

¶ 13    Mother asserts that the adjudication must be reversed because the juvenile court had reason to know that the children were Indian children based on her assertion that she was an enrolled tribal member and that the children were eligible to be enrolled.  She also claims that, considering these assertions, notice should have been sent to the Lakota and Apache tribes before the adjudicatory trial.  We disagree for three reasons.

¶ 14    First, to the extent mother argues that the adjudication must be reversed for lack of compliance with ICWA at the adjudicatory stage, she is mistaken.  This is because ICWA only applies when an Indian child is the subject of a child custody proceeding, 25 C.F.R. § 23.103(a) (2023), and an adjudicatory trial is not a child custody proceeding under ICWA, *People in Interest of M.V.*, 2018 COA 163, ¶ 35, *overruled on other grounds by E.A.M.*, ¶ 56.

¶ 15    A dispositional hearing, however, requires the court to address a child's placement, and is a "child custody proceeding under

ICWA." *Id.* at ¶ 42. We will therefore address the court's findings at that hearing for ICWA compliance.

¶ 16    Second, the record shows that mother provided no additional information about her or the children's enrollment before or at the dispositional hearing. By the date of the dispositional hearing, mother had made only general assertions of Native heritage and, thus, the court had no "reason to know" that the children were Indian children. *See E.A.M.,* ¶ 56.

¶ 17    Third, about a month after the adjudicatory trial, in accordance with its obligations under section 19-1-126(3) to exercise due diligence to gather additional information, the Department sent ICWA notices to all the Lakota Sioux and Apache tribes. Most of those tribes indicated that the children were not members of or eligible for membership in the tribe, although the Department received some of these notices after the dispositional hearing. The other tribes did not respond. The record, however, shows they received the notice at least ten days before the dispositional hearing. *See* 25 U.S.C. § 1912(a); *People in Interest of J.O.,* 170 P.3d 840, 842 (Colo. App. 2007) (noting that a child

custody hearing should not be held unless a tribe received notice at least ten days before the hearing)

¶ 18    Nonetheless, mother asserts that, under section 19-1-126(2)(b), the juvenile court was bound to treat the children as Indian children until it was determined on the record that the children did not meet the definition of "Indian child." Accordingly, she argues that the Department had to make active efforts to reunify the children with mother and comply with ICWA-related requirements before the children were removed. *See* 25 U.S.C. §§ 1912(e), 1922; 25 C.F.R. § 23.113(a).

¶ 19    But as discussed, the court did not have "reason to know" the children were Indian children based on mother's general assertions of Native heritage. And even if the court had "reason to know," any noncompliance with ICWA was harmless because the Department properly notified all potential tribes, none of whom responded that the children were Indian children. *See* C.A.R. 35(c); C.R.C.P. 61; *H.J.B.*, ¶ 64 (errors related to ICWA notice are harmless if the record establishes that the child is not an Indian child); *People in Interest of C.B.*, 2019 COA 168, ¶ 31 (any error the court may have

committed by not complying with ICWA was harmless because the children were not Indian children).

¶ 20    In sum, the record shows that, based on the information it received, the juvenile court did not have reason to know that the children were Indian children.  *See* § 19-1-126(1)(a)(I)(A); C.R. ICWA P. 3(a), (c); *E.A.M.*, ¶ 56.  We therefore conclude that the court complied with the notice provisions of ICWA and that ICWA does not apply in this case.

## III.    Caseworker as Expert Witness

¶ 21    Mother next argues that the juvenile court erred by qualifying the Department's caseworker as an expert witness because she did not have the requisite qualifications.  We disagree.

### A.    Standard of Review and Applicable Law

¶ 22    The decision to admit expert testimony lies within the juvenile court's discretion, and we will not disturb it absent an abuse of discretion.  *People in Interest of M.W.*, 140 P.3d 231, 233 (Colo. App. 2006).  A court abuses its discretion when "its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law." *People in Interest of E.R.*, 2018 COA 58, ¶ 6.

10

¶ 23    CRE 702 provides that, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

¶ 24    A court may qualify a witness as an expert under any of the five factors specified in CRE 702. *Gresser v. Banner Health*, 2023 COA 108, ¶ 47 (*cert. granted on other grounds*, Sept. 9, 2024). The rule does not require a proposed expert to belong to any particular organization or have any specific certification. *People v. Bornman*, 953 P.2d 952, 955 (Colo. App. 1997). When a witness is qualified to provide expert testimony under one or more of the factors in CRE 702 but lacks certain additional knowledge or training within their field of expertise, such deficiency goes to the weight of the expert's testimony, not its admissibility. *See People v. Lehmkuhl*, 117 P.3d 98, 104 (Colo. App. 2004); *see also Core-Mark Midcontinent, Inc. v. Sonitrol Corp.*, 2012 COA 120, ¶ 28 (the fact that an expert witness cannot support their opinion with certainty goes only to the weight to be given to the opinion and not to its admissibility).

## B. Analysis

¶ 25    Over mother's objection, the juvenile court qualified the Department's caseworker as an expert in child welfare.  Although mother argues that the caseworker did not have the requisite background or knowledge to testify as an expert, the record indicates otherwise.  The caseworker testified that she held a bachelor's degree, attended the state's caseworker academy, and maintained her continuing education requirements.  She also testified that she took a nine-hour training about completing safety assessments and an eight-hour course called "Working Toward Closure," among other trainings.  She further testified that she had been an intake caseworker for the Department for two years and had completed over 300 safety assessments.

¶ 26    On appeal, mother emphasizes that the caseworker did not have a master's degree and had not read any peer-reviewed publications on child welfare.  And mother asserts that the caseworker's background was unrelated to social work and that she had limited experience.  But the juvenile court found that the caseworker was qualified as an expert in child welfare and protection, not social work.  An expert is not required to have

12

performed a scientific or technical analysis for their testimony to be admissible. *See Core-Mark*, ¶ 34. And even though a degree or experience in social work, the study of peer-reviewed publications, or more experience as a caseworker may have bolstered the caseworker's qualifications to opine about child protection and welfare, none of these criteria was necessary to qualify her as an expert in those areas. Rather, the caseworker's lack of this experience, which mother's counsel highlighted during voir dire, went to the weight, not the admissibility, of the caseworker's expert testimony. *See Lehmkuhl*, 117 P.3d at 104.

¶ 27    To the extent that mother asserts the juvenile court did not make the findings required by *People v. Schreck*, 22 P.3d 68, 79 (Colo. 2001), regarding the reliability of the underlying scientific principles or specialized knowledge upon which the expert testimony is based, the helpfulness of the proposed expert testimony, and whether the probative value of the evidence was substantially outweighed by its prejudicial effect, she did not raise such a challenge during the trial. Accordingly, we decline to review these contentions on appeal. *See People in Interest of M.B.*, 2020

COA 13, ¶ 14 ("[G]enerally appellate courts review only issues presented to and ruled on by the lower court.").

## IV. Testimony and Body Camera Footage from Mother's Arrest

¶ 28 Finally, mother argues that the juvenile court abused its discretion when it allowed the jury to hear testimony from officers who arrested mother and view footage from the arrest. She asserts that, because no children were present during the incident, the evidence was not relevant to whether the children were dependent or neglected. We are not persuaded.

### A. Additional Facts

¶ 29 At the adjudicatory trial, the Department called two officers who investigated a trespass call involving mother. Both officers testified that, when they responded, they found mother "passed out" and unresponsive in the cab of a truck. Both officers testified that they observed drug paraphernalia in mother's lap. One officer testified that mother was very lethargic, unresponsive to their commands, and not able to keep her head up. The officers further testified that, when later categorizing evidence from the truck, they found additional drug paraphernalia, drugs, a handgun, and a

binder of birth certificates, including those of mother, the children, and others. No children were present on the night of that incident.

¶ 30   The Department also moved to admit the footage from one of the officer's body-worn cameras during his testimony. Mother objected to the footage as not relevant because the children were not present during the incident. The Department responded that, even though the children were not present, the video established safety concerns and was relevant to the question of prospective harm if the children were returned to mother. Father's counsel also objected to the footage on the grounds that it was cumulative. The court agreed that the evidence "could be" redundant but found that "seeing something is very different than just hearing about it" and overruled the parents' objections.

## B.   Standard of Review and Applicable Law

¶ 31   We review the juvenile court's decision to admit evidence for an abuse of discretion. *People in Interest of M.H-K.*, 2018 COA 178, ¶ 60.

¶ 32   Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the

15

evidence." CRE 401. However, even relevant evidence may be excluded under CRE 403 "if its probative value is substantially outweighed by the danger of unfair prejudice."

## C.    Analysis

¶ 33    Mother did not object to the officers' testimony and, thus, her arguments related to the inadmissibility of their testimony are not preserved for our review. *M.B.*, ¶ 14.

¶ 34    In addition, the footage from the officer's body-worn camera was relevant to prospective harm. *See People in Interest of G.E.S.*, 2016 COA 183, ¶ 15. Prospective harm requires a prediction of whether, based on the parent's past conduct and current circumstances, it is likely or expected that the parent will fail to provide proper parental care for a child in the future. *People in Interest of S.N.*, 2014 COA 116, ¶ 18. Contrary to mother's argument, the circumstances of mother's arrest were relevant to whether she could provide the children with proper parental care and whether the children would be in an injurious environment if returned to her care. *See id.* (noting that, for purposes of prospective harm analysis, a fact finder may consider a parent's conduct or condition, including drug use).

¶ 35    Mother also argues that the body camera footage was unfairly prejudicial and cumulative, it confused the jury, and it impaired the basic fairness of the trial.  But she does not point us to where in the record she objected to the footage on these grounds or develop these assertions in her appellate brief.  Consequently, we decline to address them further.  *See Woodbridge Condo. Ass'n, Inc. v. Lo Viento Blanco, LLC*, 2020 COA 34, ¶ 41 n.12 ("We don't consider undeveloped and unsupported arguments."), *aff'd*, 2021 CO 56.

¶ 36    Based on the foregoing, the juvenile court did not abuse its discretion when it allowed the jury to view the body camera footage from mother's arrest.

## V.    Conclusion

¶ 37    We affirm the judgment.

JUDGE LIPINSKY and JUDGE MOULTRIE concur.

17